**SPECTOR MOTOR SERVICE, Inc., v. WALSH, Tax Com'r.**

No. 34.

Circuit Court of Appeals, Second Circuit.

Dec. 24, 1943.

As Modified March 18, 1944.

810

Leo V. Gaffney, Asst. Atty. Gen., State of Connecticut (Francis A. Pallotti, Atty. Gen., State of Connecticut, on the brief), for defendant-appellant.

Cyril Coleman, of Hartford, Conn. (Israel Nair and Nair & Nair, all of New Britain, Conn., and Day, Berry & Howard, of Hartford, Conn., on the brief), for plaintiff-appellee.

Before L. HAND, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

This appeal by the Connecticut State Tax Commissioner brings up for consideration the validity of the Connecticut Corporation Business Tax of 1935, Conn. Gen.Stat., Cum.Supp.1935, § 418c, assessed against the plaintiff, a Missouri corporation having its principal place of business in Chicago, Illinois, and engaged in the interstate trucking of freight. The district court held that the statute, construed to avoid an unconstitutional burdening of interstate commerce, did not justify the tax assessed by the commissioner against the plaintiff for the period from June 1, 1937, to December 31, 1940, upon what he had found to be business done within the state. It, therefore, granted the plaintiff's prayer for an injunction against the assessment and collection of the tax and for an adjudication of its nonliability for the tax. D.C.Conn., 47 F.Supp. 671, 676. Jurisdiction was rested upon the constitutional issues and the diverse citizenship of the parties, the court holding inapplicable the prohibition of 28 U.S.C.A. § 41(1), as amended in 1937, against federal injunction of state tax proceedings, because it found no plain, speedy, and efficient remedy in the state courts. Notwithstanding the fact that the parties were in agreement with the court on this point, we have found it not free of doubt. Since, however, we have concluded that jurisdiction does exist, we shall postpone our discussion as to it until later,[1] and turn at once to the very interesting question of the extent to which an interstate trucking busi-

---

[1] See "Jurisdiction of the Federal Court," pp. 819–822, infra.

ness can be subjected to a state corporate franchise tax based fundamentally on net income allocated and attributed to the business done within the state.

Plaintiff pioneered in the development of the "two-way haul" of goods between St. Louis, Missouri, and New York City, that is, the system whereby trucks which have come East with freight are supplied with another load for the return trip after a minimum holdover at the terminals. As developed, this involved the collection of freight in less than truckload amounts at certain eastern terminals, where it was sorted and the loads consolidated and placed in the returning trucks. Hence in 1934 and in 1935, plaintiff leased terminals for its exclusive use in Chicago, Illinois, and New Britain, Connecticut, in addition to those already in existence in St. Louis, Missouri, and New York City; and later it leased another in Bridgeport, Connecticut. It has also acquired agency terminals, where it has the use of terminal facilities of some other carrier, in certain cities in Massachusetts, Rhode Island, and New Jersey. Plaintiff utilizes about 150 trucks for its interstate hauling, almost all of these being leased from its corporate affiliate, the Wallace Transport Company of Illinois. For shipments less than truckloads these trucks are loaded and unloaded at the terminals, to or from which the goods are brought or delivered by separate pickup or cartage trucks, some leased from local truckers and some owned by plaintiff. Thus, at the New Britain terminal plaintiff has five such pickup trucks, all owned by it on conditional bills of sale.

At the New Britain terminal plaintiff has 17 employees, and at the Bridgeport terminal 10, including loading, accounting, and sales personnel. Bills, as well as wages of employees, are usually paid by draft on plaintiff at Chicago, although some cash is kept in New Britain for incidental expenses. Plaintiff has a bank account in Bridgeport for collections made by its drivers, but no Connecticut employee is authorized to disburse this money. That is left entirely in the control of plaintiff's main administrative offices in Chicago, which handle all matters relating to rating and billing. Plaintiff has no real estate in Connecticut; its total physical assets there—outside of the pick-up trucks—amount to only some $1,500 or $2,000 of office equipment in the two terminals. Between one-third to one-half of the dollar volume of plaintiff's business, however, originates in Connecticut.

When plaintiff negotiated for the lease of the New Britain terminal, the lessor, as a precaution in case of future litigation regarding the lease, required the company to qualify as a foreign corporation doing business in the state and to designate the Secretary of State as its agent for service of process. Plaintiff then paid the annual statutory fee of $50 and has since maintained its qualification, paying this yearly fee. It has not applied for or received the certificate of public convenience and necessity from the Connecticut Public Utilities Commission which is a prerequisite for the doing of local business as a motor common carrier. Conn.Gen.Stat., Cum.Supp.1935, § 577c, amended by Supp. 1939, § 499e. Moreover, its permit from the Interstate Commerce Commission—granted under the so-called "grandfather clause" of § 206(a) of the Interstate Commerce Act, 49 U.S.C.A. § 306(a)—limits its traffic, except for lines from St. Louis to Chicago and to Quincy, Illinois, to interzone hauling between the West and the East. See In re Spector Motor Service, Inc., Common Carrier Application, 32 M.C.C. 443. Hence, although a very substantial part of its business originates within the state, that business must go into interstate commerce and plaintiff has not engaged in purely intrastate business.

The Connecticut Corporation Business Tax Act of 1935, Gen.Stat., Cum.Supp.1935, §§ 416c et seq., passed as a result of the recommendations of the Connecticut Temporary Tax Commission, Rep.1934, 455 et seq., imposes upon every corporation "carrying on business in this state" which has to file a report for federal income tax purposes, with certain exceptions not here material, "annually, a tax or excise upon its franchise for the privilege of carrying on or doing business within the state, such tax to be measured by the entire net income as herein defined received by such corporation or association from business transacted within the state during the income year and to be assessed at the rate of two per cent," Cum.Supp.1935, § 418c,[2] with a further provision for a minimum

[2] Effective July 1, 1937, the legislature amended § 418c to apply to every corporation not merely carrying on, but also "having the right to carry on," business in this state. Conn.Gen.Stat., Supp.1939, § 354e.

tax, more specifically defined in §§ 421c and 422c. By § 419c, net income is gross income less the deductions under the federal corporation net income tax, with certain exceptions which include "interest and rent paid during the income year."[3]

There follow special and ingenious provisions as to allocation of net income in the case of business carried on partly without the state. Sec. 420c (amended by Supp.1939, § 356e, Supp.1941, § 177f, and Supp.1943, § 292g) states: "If the trade or business of the taxpayer shall be carried on partly without the state, the business tax shall be imposed on a base which reasonably represents the proportion of the trade or business carried on within the state." Provision is then made for the allocation of certain specific receipts— interest, dividends, royalties, and gains on sales of assets—to the state of the principal place of business unless they can be "clearly established" as coming from local business or are sales or rentals of tangible property within the state—and the remainder of net income is to be allocated under rules and regulations of the commissioner, except in the case of income "derived from the manufacture, sale or use of tangible personal or real property." In the latter case the local income is found by use of an allocation fraction which is the mean or average of three ratios: (1) the ratio of tangible property in the state to all tangible property, (2) the ratio of wages and salaries paid within the state to all wages and salaries, and (3) the ratio of gross receipts assignable to the state to all gross receipts.[4] The commissioner computed the tax by use of this allocation fraction. Not great amounts are involved; the total tax for the 5½ years involved was $6,122.77, upon which the commissioner also claimed a 25 per cent penalty and interest.

Sec. 421c (amended by Supp.1939, § 357e, and Supp.1941, § 178f) provides for the minimum tax which is set up as an alternative to § 418c, and requires the corporation to pay, whichever is the larger, either the tax already defined in § 418c or the tax here defined of one mill per dollar based substantially on outstanding securities and corporate stock and reserve. Sec. 422c contains provisions for the allocation of this minimum tax in the case of business carried on partly without the state, which corresponds to the plan of § 420c for the main tax. Since the minimum tax is not involved here, we need refer to these provisions no further than to point out the extensive and ingenious steps taken by the legislators in attempting to devise a fair system of allocation between business within and without the state and yet prevent a corporation from escaping what was thought to be its fair share of the tax. See Lenox Realty Co. v. Hackett, 122 Conn. 143, 187 A. 895, 107 A.L.R. 1306.

This objective is still further emphasized by § 423c, which provides that a company's officers, when believing that the allocation method applied to it by the commissioner has operated to subject it to a tax "on a greater portion of its business than is reasonably attributable to this state," may file with its return a statement of their objections to the tax and their own alternative method, which the commissioner then passes upon; and if the method "is in fact inapplicable and inequitable," he is to redetermine the tax base by such other method of allocation "as shall seem best calculated to assign to the state for taxation the portion of the business reasonably attributable to the state." All this is, of course, subject to the general appeal to the state superior court accorded by § 435c to "any taxpayer aggrieved," with

---

[3] "Except (1) federal taxes on income or profits, losses of prior years, interest received from federal, state and local government securities and specific exemptions, if any such deductions shall be allowed by the federal government and (2) interest and rent paid during the income year." § 419c. Net income is defined in § 417c as "net earnings received during the income year and available for contributors of capital, whether they be creditors or stockholders, computed by subtracting from gross income the deductions allowed by the terms of section 419c."

[4] Thus, for the year 1940, the commissioner found for the plaintiff's business the Connecticut tangibles to represent .071479 of the total, the salaries and wages to be .059896, and the receipts to be .341149, giving a mean, i.e., one-third of the total, of .157508. The company's total receipts were $1,723,510.65, of which $587,973.59 arose in Connecticut; its net for apportionment was $426,291.01, of which $67,304.24 was allocated to the state with a tax of $1,346.08.

the court empowered to grant "such relief as may be equitable," including an order for the refund of any tax paid with interest.

■ The district court, relying on certain precedents hereinafter discussed, held that if this tax applied to a wholly interstate business it would be an undue burden thereon, contrary to Art. 1, § 8, of the United States Constitution, and hence indulged in the presumption of validity to interpret the statute as applicable only to those corporations which carried on an intrastate business. This we think is to warp the meaning beyond permissible limits. The broad sweep of the language imposing the tax and the subordinate provisions for careful allocation of the tax between business within and without the state seem to us to disclose unmistakably an intent to make the tax applicable in a case such as this. Indeed, the commission which recommended the tax envisaged its application to interstate business and carefully discussed its validity in the light of that premise. Rep., Connecticut Temporary Commission to Study the Tax Laws, 1934, 455, 456, 483; and cf. Stanley Works v. Hackett, 122 Conn. 547, 190 A. 743. It seems to us fairer to hold, as we do, that the statute was intended to apply to the allocated local business of corporations situated as was the plaintiff and then to face directly the main issue whether the tax is in fact an unconstitutional burden on interstate commerce.

The traditional dogma is that a state cannot tax interstate commerce, the business which constitutes such commerce, or the privilege of engaging in it. Cooney v. Mountain States Telephone & Telegraph Co., 294 U.S. 384, 55 S.Ct. 477, 79 L.Ed. 934; Matson Nav. Co. v. State Board, 297 U.S. 441, 56 S.Ct. 553, 80 L.Ed. 791; New Jersey Bell Telephone Co. v. State Board of Taxes, 280 U.S. 338, 50 S.Ct. 111, 74 L. Ed. 463. And the fact that some of the business is intrastate justifies a tax only on that part and not upon either the interstate business or the whole business without discrimination. Cooney v. Mountain States Telephone & Telegraph Co., supra. In the past years, however, many exceptions have served increasingly to limit this strict rule. As was said in Western Live Stock v. Bureau of Revenue, 303 U.S. 250, 254, 58 S.Ct. 546, 548, 82 L.Ed. 823, 115 A.L.R. 944: "It was not

the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing the business. 'Even interstate business must pay its way,' Postal Telegraph-Cable Co. v. Richmond, 249 U.S. 252, 259, 39 S.Ct. 265, 266, 63 L.Ed. 590."

■ Hence we now find that the person who conducts an interstate business is subject to a property tax on the instruments employed in the commerce, Western Union Tel. Co. v. Massachusetts, 125 U.S. 530, 8 S.Ct. 961, 31 L.Ed. 790; Adams Express Co. v. Kentucky, 166 U.S. 171, 17 S. Ct. 527, 41 L.Ed. 960; Old Dominion S. S. Co. v. Virginia, 198 U.S. 299, 25 S.Ct. 686, 49 L.Ed. 1059, 3 Ann.Cas. 1100, and if the instruments are used both within and without the state, a fairly apportioned tax is permitted. Pullman's Palace-Car Co. v. Pennsylvania, 141 U.S. 18, 11 S.Ct. 876, 35 L.Ed. 613; Cudahy Packing Co. v. Minnesota, 246 U.S. 450, 38 S.Ct. 373, 62 L.Ed. 827. And a domestic corporation is taxable on its earnings from interstate as well as intrastate commerce. United States Glue Co. v. Town of Oak Creek, 247 U.S. 321, 328, 38 S.Ct. 499, 62 L.Ed. 1135, Ann.Cas.1918E, 748; Atlantic Coast Line R. Co. v. Doughton, 262 U.S. 413, 420, 422, 43 S.Ct. 620, 67 L.Ed. 1051; Matson Nav. Co. v. State Board, supra. Again, the assets of a foreign corporation engaged in interstate commerce have been held taxable not only by the state in which they have acquired a business situs, First Bank Stock Corp. v. Minnesota, 301 U.S. 234, 57 S.Ct. 677, 81 L.Ed. 1061, 113 A.L. R. 228, but also by the state in which the corporation has a commercial domicile. Wheeling Steel Corp. v. Fox, 298 U.S. 193, 56 S.Ct. 773, 80 L.Ed. 1143. Finally, a franchise tax may be imposed, measured by the net income from business done within the state, including such portion of the income derived from interstate commerce as may be justly attributable to business done within the state by a fair method of apportionment. Underwood Typewriter Co. v. Chamberlain, 254 U.S. 113, 41 S.Ct. 45, 65 L.Ed. 165; Bass, Ratcliff & Gretton, Ltd. v. State Tax Commission, 266 U.S. 271, 45 S.Ct. 82, 69 L. Ed. 282; cf. Hans Rees' Sons v. North Carolina, 283 U.S. 123, 51 S.Ct. 385, 75 L.Ed. 879; Butler Bros. v. McColgan, 315 U.S. 501, 62 S.Ct. 701, 86 L.Ed. 991. Even a tax measured by gross receipts fairly

apportioned to the local commerce is no longer barred where there is not danger of duplicating taxation by other states or other inequity. Western Live Stock v. Bureau of Revenue, supra; McGoldrick v. Berwind-White Coal Mining Co., 309 U.S. 33, 60 S.Ct. 388, 84 L.Ed. 565, 128 A.L.R. 876. See the scholarly articles by Professors Lockhart, Gross Receipts Taxes on Interstate Transportation and Communication, 57 Harv.L.Rev. 40, 83-89, and Powell, New Light on Gross Receipts Taxes, 53 Harv.L.Rev. 909.

When, however, a corporation is engaged within a state solely in interstate commerce, it must be conceded frankly, and this is the basis of the thoughtful conclusion of the court below, that the Supreme Court to date has held it immune from net income taxation by that state. In 1925, in Alpha Portland Cement Co. v. Massachusetts, 268 U.S. 203, 45 S.Ct. 477, 69 L.Ed. 916, 44 A.L.R. 1219, the Court, Mr. Justice Brandeis dissenting, held invalid a Massachusetts excise tax measured in part by net income when applied to a company doing no intrastate business, but having a considerable amount of interstate business within the state, where it maintained a large office and a sales staff. This followed Ozark Pipe Line Corp. v. Monier, 266 U.S. 555, 45 S.Ct. 184, 69 L.Ed. 439 (Mr. Justice Brandeis dissenting at some length) and was, in turn, followed in 1933 in Anglo-Chilean Nitrate Sales Corp. v. Alabama, 288 U.S. 218, 53 S.Ct. 373, 77 L.Ed. 710, where Mr. Justice Cardozo wrote the dissent for himself and Justices Brandeis and Stone. Here the Court rejected the additional argument, stressed in the dissent, that the corporations had qualified to carry on intrastate business though they had not in fact done so.

■ If that were the whole story or if further our duty were limited to picking the closest unoverruled analogy in reported cases and following that blindly and mechanically, we should hold that these cases, and particularly the Alpha Cement case, had foreclosed all further discussion. But that is far from the whole story; the trends noted above have gone further in several specific cases fundamentally close to this and in divisions in the Court itself, which are certainly not without significance in forecasting the future course of the law. And our function cannot be limited to a mere blind adherence to precedent. We must determine with the best exercise of our mental powers of which we are capable that law which in all probability will be applied to these litigants or to others similarly situated. If this means the discovering and applying of a "new doctrinal trend" in the Court, Perkins v. Endicott Johnson Corp., 2 Cir., 128 F.2d 208, 217, 218, affirmed 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424, this is our task to be performed directly and straightforwardly, rather than "artfully" dodged. The Attitude of Lower Courts to Changing Precedents, 50 Yale L.J. 1448, 1459. As was said recently with rare prescience by Judge Parker in the controversial issue as to the constitutionality of the required flag salute: "Under such circumstances and believing, as we do, that the flag salute here required is violative of religious liberty when required of persons holding the religious views of plaintiffs, we feel that we would be recreant to our duty as judges, if through a blind following of a decision which the Supreme Court itself has thus impaired as an authority, we should deny protection to rights which we regard as among the most sacred of those protected by constitutional guaranties." Barnette v. West Virginia State Board of Education, D.C.S.D.W.Va., 47 F.Supp. 251, 253, affirmed 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628. We must then decide how far we think, at this point of time, the Alpha Cement decision controls this case.

In addition to the general course of decisions on state taxes, we shall examine certain specific trends disclosed by the Court and more directly applicable to the present issue. In so doing we must bear in mind at all times that the emphasis of the present Court in tax problems is on practical considerations. The trend is away from the automatic condemnation of taxes by formal, preconceived, and antiquated rules. As was said in Wisconsin v. J. C. Penney Co., 311 U.S. 435, 445, 61 S.Ct. 246, 250, 85 L.Ed. 267, 130 A.L.R. 1229: "We must be on guard against imprisoning the taxing power of the states within formulas that are not compelled by the Constitution but merely represent judicial generalizations exceeding the concrete circumstances which they profess to summarize."

■ First, we should note the now established and undenied power of a state to impose a registration or license fee on those using motor vehicles in the state, although engaged in interstate commerce, or

to impose a reasonable charge for the use of its highways by motor vehicles so employed. Hendrick v. Maryland, 235 U.S. 610, 35 S.Ct. 140, 59 L.Ed. 385; Kane v. New Jersey, 242 U.S. 160, 37 S.Ct. 30, 61 L.Ed. 222; Clark v. Poor, 274 U.S. 554, 47 S.Ct. 702, 71 L.Ed. 1199; Interstate Busses Corp. v. Blodgett, 276 U.S. 245, 48 S.Ct. 230, 72 L.Ed. 551. The Connecticut tax involved in the last case of one cent per each mile travelled within the state by an interstate carrier was sharply attacked for discrimination, as local corporations paid no such tax, being liable instead for an excise tax on their gross receipts and a general state income tax. The Court held, however, that these two sets of taxes were complementary and that there was no discrimination.

If a highway tax based on the difficult and uncertain formula of mileage within the state is to be sustained, it is clear that similar taxes, based on other formulas which are less arbitrary than that of mileage, must be equally valid. The formula used in the case at bar, for example, would be a fairer means of measuring the tax owed by a foreign corporation. It would seem, therefore, that constitutionality would be ensured for the present tax as applied to interstate trucking if the legislature clearly showed that it was intended to provide funds for the benefit and upkeep of the highways. Realizing this, it would be myopic of us to ignore practicality and demand that the legislature actually make this verbalization, without meaning to the taxpayer, to validate the measure. Of course, the Connecticut legislature could easily and properly make the statement, for it appears that in normal times from 33 to 47 per cent of the state's revenues went into the highway fund. Rep., Connecticut Temporary Commission to Study the Tax Laws, 1934, 29-56; Rep., Connecticut Commission Concerning the Reorganization of the State Departments, 1937, 149, 150. Hence, even as the tax now stands, we can expect one-third to nearly one-half the receipts to be used for the highways.

Next, we note that the present attitude of the Supreme Court to interfere only most reluctantly with a legislative scheme for apportioning income to business within and without the state, Butler Bros. v. McColgan, supra, leaves the distinction between a permissible and an assertedly unpermissible allocation under the Alpha Cement case a barren one, indeed. In the Butler Bros. case it refused to accept detailed accounting expositions showing that the allocation fraction erred by including actual interstate income in the intrastate income figure. It virtually discarded the Hans Rees' decision, supra, in which a fraction was overturned, and made a definite statement that in the future only fractions which were clearly arbitrary would be reviewed.

In practical result, therefore, the Supreme Court does now tacitly sanction the taxation of the net income from interstate commerce of a foreign corporation which does both intrastate and interstate business. A state, under the pretense of taxing income of a corporation from intrastate business, can apply a fraction to total income in order to determine intrastate income; and the result achieved is taxable, whether actual interstate income is included or not, as long as the fraction is not openly arbitrary. In Ford Motor Co. v. Beauchamp, 308 U.S. 331, 60 S.Ct. 273, 84 L.Ed. 304, Texas levied a franchise tax on the Ford Company, which was engaged in both intrastate and interstate business. The tax was allegedly based on the proportion of capital assets of the Company located in Texas, and an allocation fraction was used to reach a figure of over twenty-three million dollars. Although the Company showed that the actual value of its Texas assets was only some three millions, the tax was upheld by the Supreme Court, with only Mr. Justice McReynolds dissenting. The logical conclusion would appear to be that, provided a mere minimum of intrastate business is discovered, a substantial tax may be levied on the interstate income; while if such minimum is not discovered, no tax can be collected no matter how large is the interstate income actually developed within the state—a reductio ad absurdum in a field where we are instructed to be highly practical.

Next we must observe that at least a minority, and possibly more, of the present Court is committed to the view, expressed most forcibly by Mr. Justice Cardozo, dissenting, in Anglo-Chilean Nitrate Sales Corp. v. Alabama, supra, that the tax is properly levied on a concern which has qualified to do intrastate business, even though it is not actually so engaged. This is in line with the consistent view of the Court in construing a tax of this kind to

be one upon the privilege of "doing business in a corporate capacity," and not upon the business or activities that were the outcome of the privilege. Home Ins. Co. of New York v. State of New York, 134 U.S. 594, 10 S.Ct. 593, 33 L.Ed. 1025; Flint v. Stone Tracy Co., 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389, Ann.Cas.1912B 1312; People of State of Michigan v. Michigan Trust Co., 286 U.S. 334, 52 S. Ct. 512, 76 L.Ed. 1136. This concept is, of course, reinforced by the action of the legislature in 1937 in expressly making the tax one upon not merely the carrying on of business in the state, but also upon "the right to carry on" such business.

The district court made note of this argument, but held it inapplicable because plaintiff was not fully authorized to do business within the state unless and until it had the certificate of public convenience of the Connecticut Public Utilities Commission for the operation of intrastate trucks. But such regulations are of a police nature, comparable to licensing of motor vehicles, and can hardly be considered as affecting the fundamental franchise of the state to carry on a local business, which is the privilege upon which the tax is levied. A corporation when it becomes a local entity must, of course, submit, like all others, to numerous and increasing regulations for the public welfare; and its duty to pay taxes, once it is properly within the state, should not be made to depend upon its compliance with all such regulations.

Finally, and perhaps most important of all, are the broad trends in favor of the state-taxing power shown of late by the present Court. Perhaps most important is the announcement of the view, following that of Justice Brandeis dissenting in the three controversial cases upon which this judgment particularly rests, that it is the duty of Congress, not of the courts, to protect interstate commerce against the evils of unfair state taxation. This view has been most cogently expressed by Mr. Justice Black in persuasive dissents in Gwin, White & Prince v. Henneford, 305 U.S. 434, 59 S.Ct. 325, 83 L.Ed. 272, and J. D. Adams Mfg. Co. v. Storen, 304 U.S. 307, 316, 58 S.Ct. 913, 82 L.Ed. 1365, 117 A.L. R. 429. Thus, in the Gwin case, supra, 305 U.S. at page 455, 59 S.Ct. at page 335, 83 L.Ed. 272, he said: "I would return to the rule that—except for state acts designed to impose discriminatory burdens on interstate commerce because it is interstate—Congress alone must 'determine how far [interstate commerce] * * * shall be free and untrammelled, how far it shall be burdened by duties and imposts, and how far it shall be prohibited.' [Welton v. Missouri, 91 U.S. 275, 280, 23 L.Ed. 347]." By 1940, Mr. Justice Black had been joined by Justices Douglas and Frankfurter in dissent in McCarroll v. Dixie Greyhound Lines, 309 U.S. 176, 189, 60 S.Ct. 504, 510, 84 L.Ed. 683, where they said: "Unconfined by 'the narrow scope of judicial proceedings' Congress alone can, in the exercise of its plenary constitutional control over interstate commerce, not only consider whether such a tax as now under scrutiny is consistent with the best interests of our national economy, but can also on the basis of full exploration of the many aspects of a complicated problem devise a national policy fair alike to the States and our Union."

There can be no question that this view so compellingly expressed will have increasing weight in the deliberations of the Court and, even if it is not accepted by the majority in full, will tend to prevent the invalidating of taxes on formal grounds. We have already pointed out the increasingly favorable attitude of the Court towards gross receipts taxes. A commentator, cited supra, who considers the present Court to stand four to three against the proposition of judicial lack of power in the premises, with two justices not yet recorded, goes on to say that these circumstances "seem to foreclose any probability that taxes on gross receipts from interstate transportation and communication will be condemned on formal grounds, if otherwise unobjectionable," and that "the Court will probably sustain such a tax if it does not threaten interstate commerce with a heavier burden than local commerce, or in some other manner threaten an unfair or unreasonable burden on interstate commerce." Lockhart, 57 Harv. L.Rev. at 95.

It is perhaps these developments within the Court which led Mr. Chief Justice Stone, speaking for a unanimous court, to say, by way of dictum, it is true, but nevertheless apparently advisedly: "In any case, even if taxpayer's business were wholly interstate commerce, a nondiscriminatory tax by Tennessee upon the net income of a foreign corporation having a commercial domicile there, cf. Wheeling

Steel Corp. v. Fox, supra [298 U.S. 193, 56 S.Ct. 773, 80 L.Ed. 1143], or upon net income derived from within the state, Shaffer v. Carter, 252 U.S. 37, 57, 40 S.Ct. 221, 227, 64 L.Ed. 445; [State of] Wisconsin v. Minnesota Mining Co., 311 U.S. 452, 61 S.Ct. 253, 85 L.Ed. 274; cf. People of State of New York ex rel. Cohn v. Graves, 300 U.S. 308, 57 S.Ct. 466, 81 L.Ed. 666, 108 A.L.R. 721, is not prohibited by the commerce clause on which alone taxpayer relies." Memphis Natural Gas Co. v. Beeler, 315 U.S. 649, 656, 62 S.Ct. 857, 862, 86 L.Ed. 1090. The broad sweep of this language is noteworthy. It is not limited to a tax at the commercial domicile. (Defendant has claimed that plaintiff has a commercial domicile within the state, but we agree that its commercial domicile is in Chicago.) On the contrary, there is the flat statement that even if the taxpayer's business is *wholly* interstate commerce a nondiscriminatory tax by a state upon net income derived from within the state is not prohibited by the constitutional provision.

Here this tax certainly cannot be considered discriminatory. It is levied on all corporations carrying on business within the state, local corporations paying at the same rate as foreign ones, and with most careful provisions for the ascertainment of only income produced within the state. Indeed, if we should strike down the tax against plaintiff, we would be discriminating against intrastate business, which would still have its burdens to pay under the tax and which is just as much entitled to constitutional protection from discrimination as interstate commerce, as the dissents of Mr. Justice Brandeis and Mr. Justice Black, cited above, in particular have pointed out. As a matter of fact, such an action by us would mean that a corporation which does a vast business within the state will escape completely from contributing to the expenses of the state. There will also be offered to large interstate commerce corporations the possibility of escaping state income taxation, since the main office and the domicile of the corporation can be set up in a state with no such taxes, and the business can be kept strictly interstate. The record in this case shows how skillfully the plaintiff is avoiding heavy taxation not merely by its choice of domicile, but even by the location of its affiliate, the owner of its trucks, in a state, Illinois, where licensing fees are favorable and

reciprocity is had with other states. This business, of course, competes with the interstate railroads. Its comparative immunity from taxation seems neither equitable nor desirable—at least until and unless Congress so determines.

It is objected that if Connecticut can levy this tax then all states through which plaintiff's trucks operate can levy a somewhat similar tax, and plaintiff will be burdened by the iniquity of multiple taxation. There seem two ready answers to this suggestion. The first is that the record does not suggest that other states are making such levies, and it will be time enough to consider the problem of multiple taxation when and if it arises. Henneford v. Silas Mason Co., 300 U.S. 577, 587, 57 S.Ct. 524, 81 L.Ed. 814. The second is that if in fact other states can show as rational a basis for taxation on this business as is here shown there seems no reason why plaintiff, like its competitor railroads, should not pay the taxes so properly assessed. Mr. Justice Black has well expressed this idea in his dissent in Gwin, White & Prince v. Henneford, supra, 305 U.S. at page 448, 59 S.Ct. at page 331, 83 L.Ed. 272: "A business engaging in activities in two or more States should bear its part of the tax burdens of each. If valid, non-discriminatory taxes imposed in these States create 'multiple' burdens, such 'burdens' result from the political subdivisions created by our form of government. They are the price paid for governmental protection and maintenance in all States where the taxpayer does business. A State's taxes are not discriminatory if the State treats those engaged in interstate and intra-state business with equality and justice."

▆▆ We conclude, therefore, that the levy upon plaintiff is only of a nondiscriminatory tax upon income fairly attributable to interstate business in this state and that as such it is not prohibited under the commerce clause of the United States Constitution. Plaintiff also urges that the tax is invalid as violating both federal and state due process. We need add nothing to what we have already said save to notice a particular objection of improper delegation of legislative power to the commissioner. While this is urged on both federal and state grounds, it is said that the state rule is especially strict. State v. Stoddard, 126 Conn. 623, 13 A.2d 586; Connecticut Baptist Convention v. McCarthy, 128 Conn.

701, 25 A.2d 656. But the Connecticut court relies strongly and almost exclusively on decisions of the Supreme Court of the United States, and we do not believe it intends to adopt a peculiar local rule. Plaintiff's objection is directed particularly to the power accorded the commissioner under § 420c of allocating income within and without the state and rests upon the contention that plaintiff's income is not derived from the use of tangible personal property and hence that the allocation is made not by employment of the allocation fraction set forth in the statute, but by the alternative method, that is, "under rules and regulations of the tax commissioner." The latter is urged as the unconstitutionally broad power.

We should hesitate in this proceeding to declare even the broader alternative so defective as to make the tax unconstitutional. We have seen how unwilling the Supreme Court is to upset a method of allocation unless it is shown improper by "cogent evidence." Butler Bros. v. McColgan, supra. The method here, even down to the objected to alternative, was worked out by a very able commission in the light of what seems to have been considerable experience elsewhere;[5] and the provisions particularly objected to are additions, made after the general principle has first been stated, which, together with the further relief and appeal sections, constitute an unusual and significant attempt to avoid unfairness or injustice in special cases. But the commissioner has found the more explicit alternative to be applicable, and we are not disposed to quarrel with that administrative determination. Where "use of tangible personal property" ends and personal service begins may be often difficult to decide; at least it seems not unreasonable to conclude that a trucking business requires preëminently the use of trucks. The fact that for another purpose the Connecticut court has held "service" to be "the predominant feature" of the furnishing of food in a restaurant, Lynch v. Hotel Bond Co., 117 Conn. 128, 131, 167 A. 99, 100, does not particularly help us here. As a matter of fact, the method here employed appears to have produced a result anything but harsh in the light of the large amount of plaintiff's business which originates in this state.[6] We think this objection not well taken. Cf. Smolowe v. Delendo Corp., 2 Cir., 136 F.2d 231, 240, certiorari denied 64 S.Ct. 56; Stanley Works v. Hackett, supra.

■ A final objection to the levy is that the commissioner, in adding to plaintiff's federal net income "interest and rent paid" during the year, as provided in § 419c, included as part of the tax base here 40 per cent of the amount which plaintiff paid to its affiliate, Wallace Transport Co., for lease of the latter's trucks. The purpose of this statutory provision was carefully explained by the Commission—that a business tax should not depend upon the financial organization of a corporation, but upon the amount of the business done, and net income should include "payments and accruals to the credit of all contributors of capital— that is, rental and interest payments and accruals as well as net profits available for stockholders," thus, of course, avoiding tax evasion by the mere device of renting, instead of owning, property. Rep., Connecticut Temporary Commission to Study the Tax Laws, 1934, 471; cf. W. T. Grant Co. v. McLaughlin, 129 Conn. 663, 30 A.2d 921, and House of Hasselbach, Inc. v. McLaughlin, 127 Conn. 507, 18 A.2d 367. And this inclusion in the tax base was sanctioned by the case cited and relied on by the Commission, Atlantic Coast Line R. Co. v. Doughton, 262 U.S. 413, 422, 43 S.Ct. 620, 67 L.Ed. 1051. Its general fairness is obvious; plaintiff by causing Wallace to be incorporated for the ownership of the interstate trucks here involved should not thereby obtain an unusual tax advantage over concerns whose business is not thus divided.

When the commissioner first came to apply this provision to the "purchased transportation," he felt, and was so advised by the State Attorney-General, that he should deduct from truck rentals the expenses assignable to salaries and wages, gasoline,

[5] The Temporary Tax Commission, consisting of seven distinguished citizens of the state appointed by the Governor pursuant to Special Act No. 474 of 1933, under the chairmanship of Fred R. Fairchild, Professor of Taxation at Yale University, and with a skilled research staff, reported that this was the Massachusetts plan of allocation in use in five states and similar to the plans of six other states and found to be the most satisfactory by a Committee of the National Tax Association after a decade of study. Rep.1934, 458–460.

[6] See note 4, supra, which demonstrates how the ratio based on receipts is sharply reduced by the other two ratios.

oil, and other related expenses created by the operation of the trucks. In view of the number of taxpayers involved, he decided to establish a general ratio, rather than seek for one in each particular case, and, after taking evidence from various trucking concerns, established a mean among the amounts shown of 40 per cent. The district court has found that, while this is a fair deduction as applied to the companies examined, their operations are not fairly comparable to those of plaintiff. This was based upon some evidence introduced by plaintiff of certain differences in the operations in question, as, for example, the length of the hauls involved, and perhaps more particularly of a balance sheet of the Wallace Company showing a net loss on its operations. But we think this does not help the plaintiff to demonstrate an unconstitutional tax exaction. It appears to be assumed, though not specifically found, that the same persons who own plaintiff also own Wallace; but there is no reason shown why the separate entities should be disregarded and Wallace's losses attributed to plaintiff or how this fact shows a greater expense to be attributed to truck operation than the commissioner has found to be normal. Here, indeed, there is some reason to suppose that the expenses should be less, for plaintiff, apparently unlike the companies studied, puts its own drivers on the trucks and pays their salaries. On the face of it, the entire payment was for the lease of equipment, and it would seem that the commissioner might prima facie have disallowed the deduction in full (as he does by adding it to federal net income as provided by the statute) until and unless the plaintiff has shown its inequity. Certainly that should be true, at least in a proceeding questioning the validity of the tax, where the commissioner has gone farther and made an allowance deduced from general experience and fair, perhaps more than fair, on its face as to the taxpayer concerned. We must remember that for all specific inequities in a particular levy, the taxpayer has his full remedy under the statute, first to the commissioner and then to the courts of the state, to secure a reduction or an elimination of the tax.

*Jurisdiction of the Federal Court.* In its opinion the district court said, 47 F. Supp. at page 674: "It is agreed that no plain, speedy and efficient remedy may be had in the state courts either by appeal, Lathrop v. Norwich, 1930, 111 Conn. 616, 151 A. 183, or by injunction, Waterbury Savings Bank v. Lawler, 1878, 46 Conn. 243." It also made extensive findings of fact and conclusions of law to support this holding. These followed plaintiff's complaint, which contained not only usual jurisdictional allegations covering its constitutional claims, the diverse citizenship of the parties, the amount in controversy, and the applicability of 28 U.S.C.A. § 400, authorizing declaratory judgments, but also special allegations as to Connecticut rules of law—hereinafter discussed—to the effect that a taxpayer cannot appeal from a tax assessment by the method provided in the statute and at the same time claim the statute to be unconstitutional, that the remedy of injunction is precluded, that the commissioner threatens penalties and liens against plaintiff and its business, and that plaintiff has no plain, speedy, and efficient remedy in the state courts and is threatened with "irreparable harm." All of these allegations of the complaint the defendant expressly admitted in his answer, denying only other allegations having to do directly with the asserted invalidity of the tax. And before us, defendant, while not alluding to the court's jurisdiction, pressed strongly for an adjudication of the validity of the tax.

Notwithstanding this concurrence of view and desire of the parties for a complete adjudication, it is our duty to make an independent reëxamination of the question. The Act of August 21, 1937, 50 Stat. 738, amending Jud.Code § 24, 28 U.S.C.A. § 41(1), to deny "jurisdiction" to a district court "of any suit to enjoin, suspend, or restrain the assessment, levy, or collection of any tax imposed by or pursuant to the laws of any State where a plain, speedy, and efficient remedy may be had at law or in equity in the courts of such State," is in the public interest "to avoid needless obstruction of the domestic policy of the states." Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 298, 63 S.Ct. 1070, 1073, 87 L.Ed. 1407; cf. also Bender v. Connor, D.C.Conn., 28 F.Supp. 903. Following this clear mandate, we have considered the matter at length and conclude that jurisdiction is to be upheld on either one of two grounds which, as applied to this case, complement each other. One is that our conclusion, which, as the Huffman case points out, 319 U.S. at page 295, 63 S.Ct. at page 1071, 87 L.Ed. 1407, is in effect a declaratory judgment in favor of constitutionality, is, we think, within

the discretionary power of the federal courts under the limitations set by that case. The other is that, while we are not prepared to assert dogmatically that no remedy is available in the state courts, we are convinced that, if existing, it is anything but "plain." As in Driscoll v. Edison Light & Power Co., 307 U.S. 104, 110, 59 S.Ct. 715, 718, 83 L.Ed. 1134, "At any rate, without an authoritative determination by the state courts, we cannot say, for this character of proceeding, that the remedy in the state courts is plain, speedy and efficient." See, also, Mountain States Power Co. v. Public Service Commission of Montana, 299 U.S. 167, 170, 57 S.Ct. 168, 169, 81 L.Ed. 99, where the remedy depended upon "the problematical outcome of future consideration," and Corporation Commission of Oklahoma v. Cary, 296 U.S. 452, 458, 56 S.Ct. 300, 80 L.Ed. 324, where the opposed decisions of the state court had caused "serious uncertainty."

In the Huffman case the Court did not decide whether the statutory prohibition against tax injunctions applied also to declaratory judgments, but held that the previously existing discretionary power in the federal courts as to award of relief to a taxpayer applied to require dismissal of an action for such a judgment, without decision on the merits, when state law, with the right of appeal to the Court, afforded adequate protection to the taxpayer. The Court stressed, 319 U.S. at page 298, 63 S.Ct. at page 1073, 87 L.Ed. 1407, that "interference with state internal economy and administration" was at the base of this restraint in granting relief. Where that reason is lacking, it would seem proper to a federal court to act, in the absence of a definite prohibition by Congress; indeed, the Court has held that even a definite prohibition against suits to restrain collection of federal taxes, now 26 U.S.C.A. Int.Rev. Code, § 3653, may be waived by "earnest request" of the Government that the Court pass upon the validity of the tax law. Helvering v. Davis, 301 U.S. 619, 639, 57 S.Ct. 904, 81 L.Ed. 1307, 109 A.L.R. 1319. Here the state officials charged with the assessment of the tax are seeking a definitive adjudication; and they do so in the light of grave uncertainty—as we shall see— as to what other course will protect them speedily and efficiently in the discharge of their statutory duties. Here, in so far as it may be a matter of discretion, we hold it clear that state internal economy and administration will be promoted, rather than retarded, by adjudication on the merits.

■ Turning now to the plainness of the remedy available in the state courts, we find a considerable and definite line of authorities, applied in tax proceedings as well as generally, holding that one who accepts the remedy of appeal provided by a statute has thereby agreed to its validity and cannot at the same time challenge its legality. In addition to the Lawler case cited by the district court are Holley v. Sunderland, 110 Conn. 80, 86, 147 A. 300, 302; Young v. West Hartford, 111 Conn. 27, 149 A. 205, 207; Coombs v. Larson, 112 Conn. 236, 246, 152 A. 297; Chudnov v. Board of Appeals, 113 Conn. 49, 51, 154 A. 161, 164; and National Transp. Co. v. Toquet, 123 Conn. 468, 196 A. 344, 348. The rule has also been applied in a case where the state officials themselves sued to collect a tax. Spencer, State Treasurer, v. Consumers' Oil Co., 115 Conn. 554, 559, 162 A. 23. It appears not to prevent an action for a declaratory judgment, National Transp. Co. v. Toquet, supra, although this alone is hardly an effective remedy in view of the drastic penalties provided by the statute for the nonpayment of the tax. On the other hand, in a still later case, Connecticut Baptist Convention v. McCarthy, 128 Conn. 701, 25 A.2d 656, the court held unconstitutional the very act which it had declined to review in Holley v. Sunderland, supra, citing the Holley case without comment, and with no suggestion of its overruling this line of authorities.

In a case arising before any of the cases cited, Underwood Typewriter Co. v. Chamberlain, 92 Conn. 199, 102 A. 600, the court had held provisions for appeal to the superior court in a 1915 tax statute there under consideration sufficiently separable to allow a testing of the validity of its application to the appellant after the latter had paid the tax under protest. The appeal provisions there were similar to those provided in many instances both as to town and state taxes, and not greatly different from the provisions of the 1935 statute, § 435c, which, as we have seen above, authorizes the court to order a refunding of the tax. It is true, however, that the appeal provisions of the 1915 statute, now to be found in Conn.Gen.Stat.1930, § 1335, were more general and inclusive than those we are now considering; they, together with provisions for statements, corporate returns, and tax assessments, were part of a com-

prehensive corporation tax statute of thirty-two sections, covering such diverse cases as railroad and street railway companies, water, gas, electric power, and other public utility companies, stock insurance companies, and miscellaneous corporations. See, inter alia, Gen.Stat.1930, §§ 1087, 1097, 1107–1123, 1274, 1302–1337. On the other hand, § 435c of the 1935 statute is a limited and a closely integrated part of the one single type of tax there provided. In Torrington Co. v. Hackett, 124 Conn. 403, 200 A. 338, 340, it was given a restrictive interpretation and held unavailing to correct an error in a corporate return, disclosed only by a court decision interpreting the act favorably to the taxpayer and rendered after the statutory time for appeal of one month had expired. Under the circumstances and in the light of these various state decisions we cannot say that the statutory appeal is available for the plaintiff's contention here.

Turning now to the availability of the injunctive process, the Connecticut court has refused it in the Lawler case, supra, cited by the district court, and in other cases involving town taxes, including Wilcox v. Town of Madison, 106 Conn. 223, 137 A. 742, 743, which appears to be the last authoritative statement of the rule. The court there said that it had refused to adopt the rule resting jurisdiction "solely upon the illegality or invalidity of the tax," but instead had required a showing of threat of irreparable injury and lack of adequate remedy at law. It cited several cases where the remedy had been refused, and stated that it was aware of only two cases where it had been granted, Seeley v. Town of Westport, 47 Conn. 294, 36 Am.Rep. 70, a "flagrant case" of a tax against neither "the proper person nor the proper estate," and hence without the general rule, and City of New London v. Perkins, 87 Conn. 229, 87 A. 724, where a city, legally exempt from taxation and required to operate a ferry, was allowed to enjoin the tax collector of a neighboring town from selling for taxes land used for the ferry's public landing. Even the possibility of appeal under the statute might be held to preclude an injunction here. Moreover, precedents in actions against towns are not helpful in view of the state's immunity from suit.

No action of any kind against state taxing officials has been found, although the Underwood case, supra, does suggest that the statutory appeal should apply to make an injunction unnecessary. Against whom it should be directed is not stated. In any event, therefore, the plaintiff's right to an injunction is far from plain.

The state's immunity from suit also makes inapplicable another line of cases holding that a town tax paid under protest is under duress, so that a suit will lie against the town for its refund. Shaw v. City of Hartford, 56 Conn. 351, 15 A. 742; H. E. Verran Co. v. Town of Stamford, 108 Conn. 47, 49, 142 A. 578; Pitt v. City of Stamford, 117 Conn. 388, 167 A. 919. It seems at least doubtful whether any state official can be found who would be personally liable for a refund of the tax. In the very early case of Thames Mfg. Co. v. Lathrop, 7 Conn. 550, town selectmen were held liable in trespass for a seizure of property for a tax invalid because of their failure to perform a ministerial act. This case was distinguished and limited in Phelps v. Thurston, 47 Conn. 477, where liability was denied and the court said, at page 486, that the plaintiff might have paid his tax and "an action of assumpsit against the town would have been a plain and effective remedy." No other case applying this principle even against town taxing officials has been discovered. In Hubbard v. Brainard, 35 Conn. 563, 576, decided by a divided court and reversed on another ground in Collector of Internal Revenue v. Hubbard, 12 Wall. 1, 79 U.S. 1, 20 L.Ed. 272, recovery under the first federal income tax law was allowed against the collector of internal revenue, which, of course, is only the modern federal rule, as we discussed in Hammond-Knowlton v. United States, 2 Cir., 121 F.2d 192, 194, 195, certiorari denied 314 U.S. 694, 62 S.Ct. 410, 86 L.Ed. 555.

If personal liability were to be spelled out here, it would be difficult to decide upon whom the burden should rest. While the tax commissioner computes the tax, the 1935 statute provided in § 431c that the tax should be paid to the commissioner "in cash or by check, draft or money order drawn to the order of the state treasurer," [7] and in § 432c, entitled, "Settlement with treasur-

---

[7] For reasons not apparent, the legislature in 1943, after the decision below, amended this statute to provide that such checks should thereafter be made payable "to the order of the tax commissioner." Conn.Gen.Stat., Supp.1943, § 298g.

er," that "All funds received by the tax commissioner under the provisions of this chapter shall be recorded with the comptroller and shall be deposited daily with the state treasurer." Here are three participating state elective officials; in addition the secretary of state is to institute proceedings for the forfeiture of the charter of corporations failing to file a return, § 428c, the attorney general may sue for the tax or to foreclose a tax lien, and various deputies, marshals, county sheriffs, deputy sheriffs, and town constables have duties as to the seizure of property or other methods of collection of the tax, §§ 433c and 357c and Supp.1939, § 305e. Finally, since the responsibility of the state is not pledged for the action of any of these officials and no claim for their acts can be had except by special legislative act, Gen.Stat.1930, § 83, it is questionable whether their personal responsibility should be considered adequate for the taxpayer's protection.

Of course, we recognize that the Connecticut Supreme Court of Errors is not at all foreclosed by these decisions from finding some remedy available or, indeed, clear. That is its undoubted province. Ours is decidedly more limited. We are bound to accept state law as we find it, and can hardly justify exposition which adds by assuming only to clarify. Since we do not find a definitive state determination, we must conclude that the state remedy depends upon "the problematical outcome of future consideration," and hence that jurisdiction exists for our judgment herein. Judgment reversed for the entry of a judgment for defendant on the merits.

L. HAND (dissenting).

Section 418c of the Connecticut "Corporation Business Tax Act of 1935" imposes an excise upon the "franchise for the privilege of carrying on or doing business within the state." The plaintiff has asked no leave of the state to do its business, and needs none; nor has it a "commercial domicile" within the state which would draw upon itself the state's taxing powers. Moreover, some parts of the statute are clearly inapplicable to it: e.g. § 428c which forfeits the corporation's "corporate rights and powers" after a delinquency of two years, and even terminates "its existence as a corporation." Thus, we have before us in the barest possible form the effort of a state to levy an excise directly upon the privilege of carrying on an activity which is neither derived from the state, nor within its power to forbid. Concededly there is an unbroken line of decisions holding such a tax invalid; and in Anglo-Chilean Nitrate Sales Corp. v. Alabama, 288 U.S. 218, 53 S.Ct. 373, 77 L.Ed. 710, even the dissenting justices were careful to declare that the result might have been different if the corporation "had not sought for and obtained a privilege or franchise to do a local business in the state" (page 229 of 288 U.S., page 376 of 53 S.Ct., 77 L.Ed. 710). Moreover, the latest decision of the Supreme Court (Mayo v. United States, 319 U.S. 441, 63 S.Ct. 1137, 87 L.Ed. 1504) upset an excise, imposed directly upon an activity of the United States, by distinguishing situations in which the tax was upon an agent of the government (Graves v. New York ex rel. O'Keefe, 306 U.S. 466, 59 S.Ct. 595, 83 L.Ed. 927, 120 A.L.R. 1466), or upon property necessary to the activity (Alabama v. Boozer & King, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3, 140 A.L.R. 615), or in which a state statute regulated an agency which supplied the activity. Penn Dairies, Inc. v. Milk Control Commission of Pennsylvania, 318 U.S. 261, 63 S.Ct. 617. One ground at any rate for that distinction is that the state's action may, or may not, impose a burden upon the federal activity, for no one can say what will be the final incidence of the charge; reasoning which has also been used to validate a tax which only "indirectly" burdens interstate commerce.

It seems to me clear that we are therefore not yet justified in supposing that the distinction between an excise upon a federal activity, and an excise upon some contributing activity has ceased to exist. If I were free to start afresh, I should not myself make that distinction; it is derived, I believe, either from the actual decision in McCulloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579, or from the gloss that later cases have put upon it, depending on how seriously one takes certain parts of the opinion. I think it a barren way to treat the distribution of power in a federation like ours to say that, if a state can tax a national activity, it follows that it must have the power to cripple or frustrate it. If I could, I should hold that, while Congress had a paramount power to prevent just that—or while in plain cases possibly the courts might themselves intervene—in ordinary situations the states were free to tax all activities within their borders provided they did so equitably. The prevalent

doctrine may perhaps be accounted for because in the early days of the Republic it was natural—possibly it was necessary—to set absolute boundaries in the distribution of political power. National sentiment was weak, Congress was not disposed to a strong assertion of federal powers; and it always gives an appearance of greater authority to a conclusion to deduce it dialectically from conceded premises than to confess that it involves the appraisal of conflicting interests, which are necessarily incommensurable. All that is now past; and the Supreme Court may eventually hold that Congress alone can say when such a tax is "reasonable": conceivably, as I have suggested, it may in extreme cases undertake that duty itself. But it seems to me clear that, whatever the future may hold, it has not done so yet; but that, on the contrary, it still adheres to the old distinction.

I do not forget that the tax at bar is not levied upon an activity of the government, like the tax involved in Mayo v. United States, supra, 319 U.S. 441, 63 S.Ct. 1137, 87 L.Ed. 1504. Maybe there is a distinction between a governmental activity and an activity of individuals, like interstate commerce, though both are equally protected by the Constitution; it is certainly true that, as to regulation of interstate commerce, the notion of the paramountcy of Congress has already gained great headway. However, I can find no such incursion into the field of taxation, except in dissents; and while the doctrine I should like to see prevail may make its first advance in the "direct" taxation of interstate commerce, there appears to me to be great difficulty in finding an excuse for such a beginning that does not swallow the whole doctrine. Up to the present, so far as I can see, the immunity of interstate commerce from such taxation as such has rested upon the same considerations which still prevail as to the immunity of an activity of the United States. Moreover, the arguments which have been at times put forward—mistakenly in my opinion—to justify the second, apply equally to the first: I mean that all federal powers were expressly granted by the states, and that they have a representation in Congress which the nation has not in their legislatures.

It is always embarrassing for a lower court to say whether the time has come to disregard decisions of a higher court, not yet explicitly overruled, because they parallel others in which the higher court has expressed a contrary view. I agree that one should not wait for formal retraction in the face of changes plainly foreshadowed; the higher court may not entertain an appeal in the case before the lower court, or the parties may not choose to appeal. In either event the actual decision will be one which the judges do not believe to be that which the higher court would make. But nothing has yet appeared which satisfies me that the case at bar is of that kind; and, as I have said, I can see no good reason for making any distinction between one kind of federal activity and another. The way out is in quite another direction, and includes both. Nor is it desirable for a lower court to embrace the exhilarating opportunity of anticipating a docrine which may be in the womb of time, but whose birth is distant; on the contrary I conceive that the measure of its duty is to divine, as best it can, what would be the event of an appeal in the case before it.