## OLD DOMINION STEAMSHIP COMPANY *v.* VIRGINIA.

ERROR TO THE SUPREME COURT OF APPEALS OF THE STATE OF
VIRGINIA.

No. 231. Argued April, 25, 26, 1905.—Decided May 15, 1905.

The general rule that tangible personal property is subject to taxation
by the State in which it is, no matter where the domicil of the owner may
be, is not affected by the fact that the property is employed in interstate
transportation on either land or water.

Vessels registered or enrolled are not exempt from ordinary rules respect-
ing taxation of personal property. The artificial *situs* created as the
home port of a vessel, under § 4141, Rev. Stat., only controls the place
of taxation in the absence of an actual *situs* elsewhere.

Vessels, though engaged in interstate commerce, employed in such com-
merce wholly within the limits of a State, are subject to taxation in that
State although they may have been registered or enrolled at a port out-
side its limits.

On March 17, 1904, the Supreme Court of Appeals of the
State of Virginia, in a matter appealed from a finding of the
State Corporation Commission, entered the following findings
and order:

"That the Old Dominion Steamship Company was a non-
resident corporation, having been incorporated by the senate
and house of representatives of the State of Delaware; that it
was then and had been for many years theretofore engaged in
the transportation of passengers and freight on the Atlantic
Ocean and communicating navigable waters, between the city
of New York, in the State of New York, and Norfolk, and cer-
tain other ports within the State of Virginia. That said steam-
ship company in the prosecution of its said transportation
business owned and operated the vessel property above named;
that these vessels, with the exception of the tug Germania,
whose movements and use will be hereinafter stated, visited
various ports or points within the State of Virginia, for the
purpose of receiving freight and passengers, for which they

issued bills of lading and tickets to points outside the State of. Virginia; that owing to the shallow waters where these vessels plied it was impossible in most instances for the larger ocean-going steamers of the company to be used; that in consequence the vessels above enumerated were used to receive the freight and passengers as aforesaid, giving the shipper of freight a bill of lading for the same, destined to New York and other points outside of Virginia, and the passenger a ticket to his destination, and thus transported such freight and passengers to deeper water at Norfolk and Old Point Comfort where, upon such bills of lading and tickets, the passengers and freight were transferred to one of the larger ocean-going vessels of the steamship company, and so the ultimate destination, namely, New York, and elsewhere outside of Virginia, was reached; that any other business transacted by the above-named vessels was incidental in character and comparatively insignificant in amount; that the said vessels were built and designed for interstate traffic especially and were adjuncts to or branches of the main line of the Old Dominion Steamship Company between New York and Norfolk; that each and all of the said vessels were regularly enrolled, under the United States laws, outside of the State of Virginia, with the name and port of such enrollment painted on the stern of each of them; that the said vessels, though regularly enrolled and licensed for coastwise trade, were then used on old established routes upon navigable waters within Virginia, as follows, to wit:

"First. The steamer Hampton Roads, between Fort Monroe and Hampton and Norfolk.

"Second. The steamer Mobjack, between points in Mathews and Gloucester Counties and Norfolk.

"Third. The steamers Luray and Accomac, between Smithfield and Norfolk.

"Fourth. The steamer Virginia Dare, between Suffolk and Norfolk.

"Fifth. The steamers Berkeley and Brandon, between Richmond and Norfolk; and

"The steamers Berkeley and Brandon ply between Richmond and Norfolk. These two steamers were completed in the year 1901, or early in 1902, one of them having been constructed at the William R. Trigg shipyard in the city of Richmond, and the other outside of the State of Virginia. Early in the year 1902 they were placed upon the line between Norfolk and Richmond, one steamer leaving Richmond each evening and arriving in Norfolk each morning, thus giving a night trip every night each way between Richmond and Norfolk. At the time these steamers were placed upon this route and since that time, the Old Dominion Steamship Company has by public advertisement called attention to the fact that these two steamers were especially fitted in the matter of stateroom accommodations for carrying passengers between Richmond and Norfolk, and the said two steamers have since that time been advertising for the carriage of passengers and freight on their route between Richmond and Norfolk, and have been regularly carrying freight and passengers between the said two points in Virginia as well as taking on freight and passengers for further transportation on their ocean steamers at Norfolk. The Old Dominion Steamship Company applied under the revenue laws of the State of Virginia for a license to sell liquor at retail on each of these steamers, and on July 1, 1902, there was granted through the commissioner of the revenue of the city of Richmond a license to the Old Dominion Steamship Company for the sale of liquor at retail on each of these steamers, said licenses to expire on April 30, 1903. On or about the same time, the said steamship company complied with the revenue laws of the United States, and paid the necessary revenue tax through the custom house at the city of Richmond for the purpose of selling liquor at retail on each of these steamers. In the spring of 1903, the said steamship company, in order to obtain licenses to sell liquor at retail on each of these steamers, applied for the same in the city of Richmond and complied with the requirements of section 143 of the new revenue law, approved April 16, 1903, and so ob-

tained licenses for the years 1903–1904 to sell liquor at retail on each of these steamers on their route between the cities of Richmond and Norfolk, and likewise, on or about the same time, complied with the revenue laws of the United States in the matter of selling liquor at retail on each of the said steamers on said route.

"Sixth. The steam tug Germania, which was used in the harbor of Norfolk and Hampton Roads for the purpose of docking the large ocean-going steamers of the Old Dominion Steamship Company, and the transferring from different points in those waters freight from connecting lines destined to points outside of Virginia.

"And the court, having maturely considered said transcript of the record of the finding aforesaid and the arguments of counsel, is of opinion that the legal *situs* of the vessels and barges assessed for taxation by the finding of the state corporation commission is, for that purpose, within the jurisdiction of the State of Virginia, and that said property is amenable to the tax imposed thereon—notwithstanding the fact that said vessels and barges are owned by a non-resident corporation, that they may have been enrolled under the act of Congress at some port outside the State of Virginia, and that they are engaged, in part, in interstate commerce—and doth so decide and declare. Therefore it seems to the court here that the finding of the state corporation commission appealed from is without error, and said finding is approved and affirmed. It is further considered by the court that the appellee recover against the appellant thirty dollars damages and its costs by it about its defense expended upon this appeal."

To review this order the Old Dominion Steamship Company sued out this writ of error.

*Mr. William H. White* for plaintiff in error:

The State of Virginia cannot, consistently with Art. I, § 8, cl. 3, of the Constitution of the United States and the act of Congress pursuant thereto, lawfully tax vessels owned by

non-resident citizens, duly enrolled under the navigation laws of the United States licensed for and engaged in the coastwise trade. §§ 4141, 4313–4315 Rev. Stat.; *Transportation Co.* v. *Wheeling,* 99 U. S. 278; *Pullman Co.* v. *Twombly,* 29 Fed. Rep. 665; *Railroad Co.* v. *Maryland,* 21 Wall. 456; *Hays* v. *Pacific Mail S. S. Co.,* 17 How. 596. The steamboat property involved in this case, operated as described in the certificate of facts, is as clearly engaged in the business and commerce of the country upon its highways as was the property in the cases cited. They are neither owned by citizens or residents of Virginia, nor enrolled or registered in that State. The record does not show whether these vessels were actually taxed at their home port or not but that matters not as they are liable to taxation there and that answers the law. *Morgan* v. *Parham,* 16 Wall. 471; *Roberts* v. *Charlevoix,* 60 Michigan, 192; *Johnson* v. *De Bary Baya Line,* 37 Florida, 499.

If the principle contended for by the Commonwealth in this case is conceded it would follow that while she could equally tax the vessel property of her own citizens, she could equally tax the vessel property of the citizens of any of the other States, which might be found in her waters, and likewise expose the vessel property of her own citizens to be taxed by the other States in whose waters they might be found trading. The confusion and injustice following such a condition is more than an ample justification of the principle which permits such property to be taxable only at its legal *situs* or "home port" and not anywhere that it may be actually found trading in the waters of any State of the Union.

*Mr. William A. Anderson,* Attorney General of the State of Virginia, for defendant in error:

The general and unquestioned doctrine is that the State has the right to tax all property, movable as well as immovable, actually located within its confines.

And this is the law as to tangible property, without reference to the domicil of its owner.

The ancient fiction of the Roman law—*mobilia sequuntur personam*—does not apply to tangible movable personal property. *State Tax on Foreign-held Bonds,* 15 Wall. 300; Story Conflict of Laws, 7th ed., § 550; Judson on Taxation, § 393; 1 Cooley, Taxation, 3d ed., 22; *Transit Co.* v. *Lynch,* 177 U. S. 152.

The only limitation upon this power in the States is that it shall not be so exercised as to hinder or interfere with interstate or international commerce. The tax, therefore, cannot be levied upon the business of interstate commerce, but it can be levied upon property used in interstate commerce. A tax on ships does not violate the commerce clause of the Federal Constitution. The only question is whether they are properly within the jurisdiction of the State levying the tax. *Ravennel* v. *Charleston,* 4 Rich. L. 286.

A State may levy a tax on steamboats plying exclusively in its own waters, owned by its own citizens, although enrolled and licensed as coasting vessels, under the laws of the United States. *Lott* v. *Mobile Trade Co.,* 43 Alabama, 518; *Gloucester Ferry case,* 114 U. S. 206; *N. W. Lumber Co.* v. *Chehalis County,* 64 Pac. Rep. 909; *N. & W. Railway Co.* v. *Board of Public Works,* 97 Virginia, 23; *Mintun* v. *Hays,* 2 California, 590.

The fact that these vessels are engaged in interstate commerce, according to the repeated adjudications of this court, fails to give to the instruments and vehicles, which carry such traffic between the States, immunity from taxation by the State in whose jurisdiction such vehicles have their actual *situs. Perry* v. *Torrance,* 32 Am. Dec. 725; *Pullman Palace Car Co.* v. *Pennsylvania,* 141 U. S. 30; *Denver & R. G. Ry.* v. *Church,* 17 Colorado, 1; *Adams Express Co.* v. *Ohio,* 165 U. S. 194; *Adams Express Co.* v. *Ohio,* 166 U. S. 185; *American Refrigerator Co.* v. *Hall,* 174 U. S. 70.

Cases cited by plaintiff in error can be distinguished as the vessels in those cases were only temporarily in the State where the taxation was held illegal.

The claim that these vessels, although habitually, continu-

ously and permanently within the jurisdiction of Virginia, and regularly engaged in carrying interstate and intra-state commerce, exclusively between Virginia ports, are immune from taxation in Virginia because their Delaware owner has had them enrolled in New York, or Delaware, or somewhere outside of Virginia cannot be sustained.

Although this question has been decided by the highest courts of several of the States, where it has arisen, in favor of the validity of the tax, it does not seem to have ever been directly adjudicated by this court; yet the reason and principles of the decisions by this court as to the liability of personal property generally, and particularly as to the liability of the vehicles of commerce upon land, to taxation by the State in whose jurisdiction they are actually located, fully sustain the legality and the rightfulness of the taxation of these vessels by Virginia.

MR. JUSTICE BREWER, after making the foregoing statement, delivered the opinion of the court.

The facts being settled, the only question is one of law. Can Virginia legally subject these vessels to state taxation? The general rule is that tangible personal property is subject to taxation by the State in which it is, no matter where the domicil of the owner may be. This rule is not affected by the fact that the property is employed in interstate transportation. *Pullman's Palace Car Company* v. *Pennsylvania*, 141 U. S. 18, in which Mr. Justice Gray, speaking for the court, said (p. 23):

"It is equally well settled that there is nothing in the Constitution or laws of the United States which prevents a State from taxing personal property, employed in interstate or foreign commerce, like other personal property within its jurisdiction."

See also *Cleveland &c. Railway Co.* v. *Backus*, 154 U. S. 439, 445; *Western Union Telegraph Co.* v. *Taggart*, 163 U. S. 1, 14.

This is true as to water as well as to land transportation. In *Gloucester Ferry Company* v. *Pennsylvania*, 114 U. S. 196,

217, Mr. Justice Field, in delivering the opinion of the court, after referring to certain impositions upon interstate commerce, added:

"Freedom from such impositions does not, of course, imply exemption from reasonable charges, as compensation for the carriage of persons, in the way of tolls or fares, or from the ordinary taxation to which other property is subjected, any more than like freedom of transportation on land implies such exemption."

See also *Passenger Cases*, 7 How. 283, in which Mr. Justice McLean said (p. 402):

"A State cannot regulate foreign commerce, but it may do many things which more or less affect it. It may tax a ship or other vessel used in commerce the same as other property owned by its citizens."

The same doctrine is laid down in the same case by Mr. Chief Justice Taney (p. 479). See also *Transportation Company* v. *Wheeling*, 99 U. S. 273. That the service in which these vessels were engaged formed one link in a line of continuous interstate commerce may affect the State's power of regulation but not its power of taxation. True, they were not engaged in an independent service, as the cabs in *Pennsylvania Railroad Company* v. *Knight*, 192 U. S. 21, but, being wholly within the State, that was their actual *situs*. And, as appears from the authorities referred to, the fact that they were engaged in interstate commerce does not impair the State's authority to impose taxes upon them as property. Indeed, it is not contended that these vessels, although engaged in interstate commerce, are not subject to state taxation, the contention being that they are taxable only at the port at which they are enrolled. In support of this contention the two principal cases relied upon are *Hays* v. *The Pacific Mail Steamship Company*, 17 How. 596, and *Morgan* v. *Parham*, 16 Wall. 471. Registry and enrollment are prescribed by sections 4141 and 4311, Rev. Stat., for vessels of the United States engaged in foreign and domestic commerce. Section 4141 reads:

"SEC. 4141. Every vessel, except as is hereinafter provided, shall be registered by the collector of that collection district which includes the port to which such vessel shall belong at the time of her registry; which port shall be deemed to be that at or nearest to which the owner, if there be but one, or, if more than one, the husband or acting and managing owner of such vessel, usually resides."

By sections 4131 and 4311 vessels registered or enrolled are declared to be deemed vessels of the United States. As stated by Chancellor Kent, in his Commentaries, vol. 3, p. *139:

"The object of the registry acts is to encourage our own trade, navigation, and ship-building, by granting peculiar or exclusive privileges of trade to the flag of the United States, and by prohibiting the communication of those immunities to the shipping and mariners of other countries. These provisions are well calculated to prevent the commission of fraud upon individuals, as well as to advance the national policy. The registry of all vessels at the custom house, and the memorandums of the transfers, add great security to title, and bring the existing state of our navigation and marine under the view of the General Government. By these regulations the title can be effectually traced back to its origin."

This object does not require and there is no suggestion in the statutes that vessels registered or enrolled are exempt from the ordinary rules respecting taxation of personal property. It is true by sec. 4141 there is created what may be called the home port of the vessel, an artificial *situs*, which may control the place of taxation in the absence of an actual *situs* elsewhere, and to that extent only do the two cases referred to go.

In *Hays* v. *Pacific Mail Steamship Company, supra*, ocean steamers owned and registered in New York and regularly plying between Panama and San Francisco and ports in Oregon, remaining in San Francisco no longer than was necessary to land and receive passengers and cargo and in Benicia only for repairs and supplies, were held not subject to taxation

by the State of California. In the course of the opinion, by Mr. Justice Nelson, it was said (p. 599):

"We are satisfied that the State of California had no jurisdiction over these vessels for the purpose of taxation; they were not, properly, abiding within its limits, so as to become incorporated with the other personal property of the State; they were there but temporarily, engaged in lawful trade and commerce with their *situs* at the home port, where the vessels belonged, and where the owners were liable to be taxed for the capital invested, and where the taxes had been paid."

Clearly the ruling was that these steamers had acquired no actual *situs* within the State of California; that occasionally touching at ports in the State did not make them incorporated with the other personal property of the State. Hence, having no *situs* in California they were not subject to taxation there, but were subject to state taxation at the artificial *situs* established by their registry.

In *Morgan* v. *Parham, supra,* it appeared that a steamship was registered in New York, under the ownership of the plaintiff; that she was employed as a coasting steamer between Mobile and New Orleans; that she was regularly enrolled as a coaster in Mobile by her master and received a license as a coasting vessel for that and subsequent years. It was held that she was not subject to taxation by the State of Alabama. Mr. Justice Hunt, in delivering the opinion of the court, said (pp. 474, 476):

"The fact that the vessel was physically within the limits of the city of Mobile, at the time the tax was levied, does not decide the question. Thus, if a traveler on that day had been passing through that city in his private carriage, or an emigrant with his worldly goods on a wagon, it is not contended that the property of either of these persons would be subject to taxation as property within the city. It is conceded by the respective counsel that it would not have been.

"On the other hand this vessel, although a vehicle of commerce, was not exempt from taxation on that score. A steam-

boat, or a post-coach engaged in a local business within a State may be subject to local taxation, although it carry the mail of the United States. The commerce between the States may not be interfered with by taxation or other interruption, but its instruments and vehicles may be. . . . It is the opinion of the court that the State of Alabama had no jurisdiction over this vessel for the purpose of taxation, for the reason that it had not become incorporated into the personal property of that State, but was there temporarily only."

In other words, here as in the prior case, there was no actual *situs* of the vessel. She had not become commingled with the general property of the State and was therefore subject to taxation at the artificial *situs*, the port of her registry.

In *Transportation Company* v. *Wheeling, supra,* Mr. Justice Clifford concludes his discussion with this statement (p. 285):

"From which it follows, as a necessary consequence, that the enrollment of a ship or vessel does not exempt the owner of the same from taxation for his interest in the ship or vessel as property, upon a valuation of the same, as in the case of other personal property."

Of course, if the enrollment does not exempt vessels from taxation as other personal property, the place of enrollment, whether within or without the State in which the property is actually situated, is immaterial, for other like property is taxable at its actual *situs*.

So far as the state authorities are concerned reference may be made to *Lott, Tax Collector,* v. *Mobile Trade Company,* 43 Alabama, 578; *National Dredging Company* v. *The State,* 99 Alabama, 462; *Northwestern Lumber Company* v. *Chehalis County,* 25 Washington, 95.

Our conclusion is that where vessels, though engaged in interstate commerce, are employed in such commerce wholly within the limits of a State, they are subject to taxation in that State, although they may have been registered or enrolled at

a port outside its limits. The conclusion, therefore, reached by the Court of Appeals of Virginia was right, and its judgment is .

*Affirmed.*