[No. 37249. En Banc. April 23, 1964.]

WILBUR J. SMITH, *Appellant,* v. THE STATE OF WASHINGTON, *Respondent.*
LONGVIEW TUGBOAT COMPANY, *Appellant,* v. THE STATE OF WASHINGTON, *Respondent.**

*Reported in 391 P. (2d) 718.

*John F. McCarthy*, for appellants.

*The Attorney General, Henry W. Wager* and *James A. Furber, Assistants,* for respondent.

HALE, J.—Shall the happy picture of tugboats and barges, log booms and rafts, and ships of the sea—towing and being towed in bustling harmony upon the broad waters of the mighty Columbia—suffer the discordant intrusion of the business and occupation tax? Appellants, skipper and tugboat company alike, say no; the tax commission says yes. We must decide.

Wilbur J. Smith, individually, and Longview Tugboat Company, a corporation, plaintiffs, operate tugboats and barges on the Columbia River and its tributaries. From

findings of fact based on an agreed statement of facts, we observe that appellants carry on their tug and barge business as common carriers under a certificate of authority issued by the Interstate Commerce Commission, pursuant to the Interstate Commerce Act, Part III (49 U.S.C.A. §§ 901-923). In addition, the United States has licensed plaintiffs' vessels for coastwise trade. 46 U.S.C.A. § 251. Plaintiffs do not engage in the buying or selling of goods or commodities in the state of Washington, nor do they operate docks, wharves, warehouses or other facilities for receiving or transferring cargo transported by them. They limit their business activities to transporting the property of others as common carriers upon navigable waters.

Plaintiffs own neither booming nor rafting facilities, but tow logs assembled into rafts by others. Plaintiff Smith does own some log raft moorage facilities, in both Oregon and Washington waters of the Columbia. These moorage facilities consist of wooden piles driven into the riverbed at points below the line of low tide and are used solely for tying up log rafts during times that they are not being towed. Plaintiff Longview Tugboat Company owns no log moorage facilities but uses those of plaintiff Smith, paying him a monthly rental.

June 20, 1958, defendant state of Washington, through its State Tax Commission, levied and assessed a tax against plaintiff Wilbur J. Smith in the sum of $4,839.37, and against Longview Tugboat Company in the sum of $959.88 under the business and occupation tax law of the state. RCW 82.04.010, *et seq.*, and RCW 82.04.290 particularly. After paying these assessments under protest, plaintiffs brought action to recover, urging that the purported tax constitutes both an interference with their rights on navigable waters and an impermissible burden on interstate commerce.

The business activities of plaintiffs can be said to fall into 6 fairly distinct categories. We classify them separately, stating each of the party's position concerning each activity in this way:

1. Direct and continuous towing of log rafts and booms between points in Washington to points in Oregon and

from points in Washington to points in Oregon. The state makes no claim and puts no assessment upon either of these activities.

2. Towing of log rafts from points in Oregon to a final destination in Washington, but interrupting or stopping the journey one or more times to tie up the log rafts at plaintiff Smith's log moorage areas in Washington, before final delivery in Washington. The tax commission apportions the tax on this activity by assessing upon that part of the service from the point where the logs are moored at plaintiff's moorage facility to final delivery. The assessment apparently is on a pro rata basis with a tax upon that share of the gross revenue derived through towing the logs from the moorage to the place of final delivery.

3. Towing of log rafts between points of origin in Washington to points of delivery in Oregon with interruptions and stops at plaintiff Smith's log moorage facilities in Washington. The State Tax Commission, similar to its position in activity No. 2 above, claims a tax on that apportioned part of the service from the point of origin in Washington to the stopping of the towage at the plaintiff's moorage facility in Washington.

4. Movements from points of origin in Washington to points in Washington where a part of the towage takes place in Oregon's territorial waters of the Columbia because of the ordinary incidents of navigation. That portion of the journey taking place in Washington waters only is claimed assessable, except where, from examination of appellants' books, the commission could not exactly apportion the income from transportation within and without the state it assessed on a 50 per cent basis, *i.e.*, it claimed one half of the income as being derived from service rendered in Washington.

5. Plaintiffs' tugboats help ships sailing in foreign and interstate commerce in docking, departing, turning around, and moving from one pier to another. Some of this was done entirely in Washington waters and some partially in Washington and partly in Oregon waters.

The tax was assessed pro rata on only that part of the activity taking place in Washington waters.

6. Occasional rentals of boom sticks, tugboats and other personal property by plaintiff Smith to persons in Washington. Neither Smith nor Longview Tugboat Company has offices in Washington. These rental arrangements are usually made in and rental paid in Oregon. The tax commission assessed the business and occupation tax on the rentals made to Washington residents.

From a judgment sustaining the tax as assessed and apportioned by the tax commission and dismissing the action, plaintiffs appeal.

The tugboat men claim a strong tide of federal and state sovereignty running in their favor against which they say the tax commission can make no headway. They say that the concurrent jurisdiction over the Columbia granted to Oregon on admission, coupled with the paramount power of federal sovereignty over navigable rivers and navigation, make them immune from legislative action by Washington concerning activities on the Columbia.

Appellants first argue that the tax here imposed does violence to rights forever granted them under § 2 of the Oregon Admission Act, 11 Stat. 383, chapter 33, § 2.[1] Under this enactment, the Columbia and other rivers were declared to be common highways, to be kept free to all citizens of the United States of tax, duty, impost or toll. Appellants read the expression *concurrent jurisdiction on the Columbia* to imply that the tax here imposed impairs Oregon's concurrent jurisdiction over the whole of the Columbia and thus deprives citizens of Oregon and the United States of the protection granted under the *Admission Act, supra.*

That Washington and Oregon exercise concurrent

[1] "The said State of Oregon shall have concurrent jurisdiction on the Columbia and all other rivers and waters bordering on the said State of Oregon, so far as the same shall form a common boundary to said State, and any other State or States now or hereafter to be formed or bounded by the same; and said rivers and waters, and all the navigable waters of said State, shall be common highways and forever free, as well as to the inhabitants of said State as to all other citizens of the United States, without any tax, duty, impost, or toll therefor."

jurisdiction over the Columbia River has not been doubted since *Nielsen v. Oregon,* 212 U.S. 315, 53 L. Ed. 528, 29 S. Ct. 383 (1909), but that case also declares that each state exercise state sovereignty over that part of the Columbia within its territorial boundaries to the exclusion of the other. Thus it holds that a citizen and resident of Washington who operated a net or seine within 3 miles of the mouth of the Columbia, on the Washington portion of the river, under a license from the fish commissioner of Washington, could not be found guilty in an Oregon court of violating Oregon statutes making it unlawful to operate a purse seine on any river of the state within 3 miles of the river mouth. The court said:

" . . . It is enough to decide, as we do, that for an act done within the territorial limits of the State of Washington under authority and license from that State one cannot be prosecuted and punished by the State of Oregon."

Moreover, the purported grant of concurrent jurisdiction to Oregon and Washington on the Columbia in the Oregon Admission Act cannot be held to grant to one state powers not held equally by another. Each state on admission becomes the equal of all others.

So it was said in *Coyle v. Smith,* 221 U.S. 559, 55 L. Ed. 853, 31 S. Ct. 688 (1911):

"The plain deduction from this case is that when a new State is admitted into the Union, it is so admitted with all of the powers of sovereignty and jurisdiction which pertain to the original States, and that such powers may not be constitutionally diminished, impaired or shorn away by any conditions, compacts or stipulations embraced in the act under which the new State came into the Union, which would not be valid and effectual if the subject of congressional legislation after admission."

And, on the subject of the paramount power of the United States to regulate and control navigable waters, the court said:

"That the power of Congress to regulate commerce among the States involves the control of the navigable waters of the United States over which such commerce is conducted is undeniable; but it is equally well settled that the control

of the State over its internal commerce involves the right to control and regulate navigable streams within the State until Congress acts on the subject. This has been the uniform holding of this court since *Willson v. Black Bird Creek Marsh Co.*, 2 Pet. 245; *Gilman v. Philadelphia*, 3 Wall. 713; *Escanaba Co. v. Chicago*, 107 U.S. 678, 683."

■ That Washington claims to the middle of the Columbia beginning at a point in the Pacific Ocean 1 marine league west of the mouth of the river and thence upstream on a line through the center of the river is evident by amendment 33 to the state constitution (Const. Art. 24, § 1) and the enactment of RCW chapter 43.58, setting up and defining the powers and duties of the Washington-Oregon boundary commission. We would say, then, that nothing of a legislative nature has taken place in this state since its admission to the Union which indicates a purpose to yield any part of its sovereign powers in the Columbia, and the power to tax is an incident of such sovereignty. *McCulloch v. Maryland*, 17 U.S. 159 (4 Wheat. 316), 4 L. Ed. 579 (1819); *Ward v. Maryland*, 79 U.S. 418 (12 Wall. 418), 20 L. Ed. 449 (1870); *State Tax Comm. of Utah v. Aldrich*, 316 U. S. 174, 86 L. Ed. 1358, 62 S. Ct. 1008, 139 A.L.R. 1436 (1942).

■ And the power of a state to tax within its boundaries embraces all persons, property and pursuits except as the power may be limited by the constitution of the state or the United States. *Moran v. New Orleans*, 112 U.S. 69, 28 L. Ed. 653, 5 S. Ct. 38 (1884); *Greenough v. Tax Assessors*, 331 U.S. 486, 91 L. Ed. 1621, 67 S. Ct. 1400, 172 A.L.R. 329 (1947). Exercised within constitutional limits, the power of a state to tax has been called plenary, and all subjects over which this sovereign power extends are objects of taxation. *McCulloch v. Maryland, supra; Loan Ass'n v. Topeka*, 87 U.S. 655 (20 Wall. 655), 22 L. Ed. 455 (1874); *Railroad Co. v. Peniston*, 85 U.S. 5 (18 Wall. 5), 21 L. Ed. 787 (1873); *Leigh v. Green*, 193 U.S. 79, 48 L. Ed. 623, 24 S. Ct. 390 (1904); *Madden v. Kentucky*, 309 U.S. 83, 84 L. Ed. 590, 60 S. Ct. 406, 125 A.L.R. 1383 (1940).

■ Accordingly, we conclude that the Oregon Admission Act, granting to Oregon concurrent jurisdiction on the Columbia and to any other state bounded by the same and declaring the navigable water to be a common highway and forever free, did not deprive either state of the sovereign power to legislate on intrastate matters with respect to the waters of the Columbia within its boundaries.

Did licensing of appellants for coastwise trade (46 U.S.C.A. § 251, 64 Stat. 577, *et seq.*) or subjecting them to regulations under the Interstate Commerce Act, Part III (49 U.S.C.A. §§ 901-923; 54 Stat. 929) save them from the business and occupation tax in Washington?

■ We read the former to be simply an act enrolling and licensing vessels of prescribed standards and size to engage in coastwise trade and fisheries. The enrollment and licensing of a vessel does not of itself exclude the right of a state to exact a license from its own citizens for the ownership and use of such property having its situs within the state. *Wiggins Ferry Co. v. East St. Louis,* 107 U. S. 365, 27 L. Ed. 419, 2 S. Ct. 257 (1882). Nor does putting ships in interstate commerce on navigable waters deprive a state of its power to levy ad valorem taxes upon them in the same manner as it taxes other property within its territorial jurisdiction. *Ott v. Mississippi Valley Barge Line Co.,* 336 U.S. 169, 93 L. Ed. 585, 69 S. Ct. 432 (1949); *Old Dominion S. S. Co. v. Virginia,* 198 U. S. 299, 49 L. Ed. 1059, 25 S. Ct. 686 (1905); *Ayer & Lord Tie Co. v. Kentucky,* 202 U.S. 409, 50 L. Ed. 1082, 26 S. Ct. 679 (1906); *Southern Pac. Co. v. Kentucky,* 222 U.S. 63, 56 L. Ed. 96, 32 S. Ct. 13 (1911).

Referring directly to enrollment and license for the coasting trade, the supreme court said:

"But such enrolment and license confer no immunity from the operation of valid laws of a state." *Smith v. Maryland,* 59 U.S. 71 (18 How. 71), 15 L. Ed. 269 (1855).

Nor does the Interstate Commerce Act, Part III, *supra,* subjecting appellants to regulation as interstate water carriers and bringing them within the jurisdiction of the Interstate Commerce Commission as a common carrier, raise a conflict between federal and state sovereignties on the mat-

ter of imposing a business and occupation tax on intrastate activities. In neither this act nor in the coastwise licensing and enrolling statute (46 U.S.C.A. § 251) has Congress sought to limit the power of the states to impose taxes upon intrastate commerce, even though interstate commerce may be affected by such taxes in one way or another. In *Kelly v. Washington ex rel., Foss Co.*, 302 U. S. 1, 82 L. Ed. 3, 58 S. Ct. 87 (1937), the court stated:

"Under our constitutional system, there necessarily remains to the States, until Congress acts, a wide range for the permissible exercise of power appropriate to their territorial jurisdiction although interstate commerce may be affected. . . ."

And, further:

". . . The principle is thoroughly established that the exercise by the State of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so 'direct and positive' that the two acts cannot 'be reconciled or consistently stand together.' . . .

". . .

"The application of the principle is strongly fortified where the State exercises its power to protect the lives and the health of its people. But the principle is not limited to cases of that description. It extends to exertions of state power directed to more general purposes. . . ."

In *New York ex rel. Cornell Steamboat Co. v. Sohmer*, 235 U.S. 549, 59 L. Ed. 355, 35 S. Ct. 162 (1915), the very point involved here arose. New York had imposed a tax on the gross income of corporations for the privilege of carrying on business within the state. The business activities sought to be taxed consisted of hauling on navigable waters between points in New York partly through New Jersey waters. Answering the taxpayer's contention that the tax set up a conflict with federal statutes granting it a license to engage in the coastwise trade, the court said:

". . . The tax here in question does not impose a license tax as a prerequisite to the navigation of the river . . .

". . . In other words, the charge is not upon the navigation of the river, but is upon the doing of business

as a corporation of the State within the State. While the State may not require a navigation license except in very exceptional cases, as for compensation for improvements which the State has made, a situation not presented here, it may, certainly as to a corporation of its own creation having property within its borders enforce its usual and customary systems of taxation without infraction of the superior authority and laws of the United States concerning the navigation of rivers." *New York ex rel. Cornell Steamboat Co. v. Sohmer, supra.*

We have said many times that the business and occupation tax is not a licensing provision for the regulation of a business or calling, nor does it impose conditions prerequisite to engaging in business within the state. It is, on the contrary, a tax imposed for revenue only. *Rainier Nat. Park Co. v. Henneford,* 182 Wash. 159, 45 P. (2d) 617 (1935); *Mason, Inc. v. State Tax Comm.,* 188 Wash. 98, 61 P. (2d) 1269 (1936). Similarly, we upheld a public utility tax upon the apportioned gross revenues of an interstate toll bridge in *Columbia River Bridge Co. v. State,* 46 Wn. (2d) 385, 282 P. (2d) 283 (1955). Accordingly, we conclude that the imposition of the business and occupation tax herein assessed is not precluded either by licensing and enrolling appellants for coastwise trade or placing them under regulation by the Interstate Commerce Commission.

This brings us to the question of interstate commerce generally.

Did the business and occupation tax here assessed place an impermissible burden upon interstate commerce?

■ The commerce clause, U.S. Const. Art. 1, § 8, conferring on the Congress power to regulate commerce with foreign nations and among the several states, does not, nor was it designed to, lift from commodities and transactions affected by or affecting or moving in interstate commerce, their fair share of the states' taxing burden. Rather, its purpose is to enable the Congress to do economically what the other articles of the constitution do politically—bind the nation together. And, to that end, it has been steadfastly construed to prevent the several states from erecting barriers against, or placing burdens upon, the free flow of

goods, people and business in all directions simultaneously at home and abroad, yet leaving to each state the power to impose its taxes upon the goods and transactions which, though a part of, or affecting or affected by, interstate commerce, are, nevertheless, intrastate in character.

Thus, by applying the principles of apportionment, states may tax that part of an interstate transaction which takes place within the state. Early in our history, the Supreme Court of the United States upheld a tax by Pennsylvania upon the gross receipts of railroads and canal companies derived in part through the carriage of goods from one state to another (*Philadelphia & Reading R. Co. v. Pennsylvania,* 82 U.S. 284 (15 Wall. 284), 21 L. Ed. 164 (1872)), but apparently at the time had not yet discovered the need for an apportionment rule. Not so, however, in *Maine v. Grand Trunk R. Co.,* 142 U.S. 217, 35 L. Ed. 994, 12 S. Ct. 121 (1891), where it featured the apportionment idea by upholding an annual excise tax for the privilege of operating a railroad within the state, measured by the gross receipts, and levied pro rata upon that portion of the receipts derived from the operations within the state. The court said:

" . . . The rule of apportioning the charge to the receipts of the business would seem to be eminently reasonable, and likely to produce the most satisfactory results . . .

" . . . There is no levy by the statute on the receipts themselves, either in form or fact; they constitute . . . simply the means of ascertaining the value of the privilege conferred."

And, we find *New York ex rel. Cornell Steamboat Co. v. Sohmer,* 235 U.S. 549, 59 L. Ed. 355, 35 S. Ct. 162 (1915), particularly pertinent to problems of apportionment as well as to licensing in coastwise trade. That case, as we earlier noted, emanated from an annual excise tax levied upon corporate gross earnings for the privilege of doing business in New York State. New York assessed earnings of the steamboat company which were "derived from towing charges upon the Hudson River (navigable waters of the United States), earned with vessels enrolled and licensed

by the U. S. Government." Tows for upriver points on the Hudson were made up at a stake boat at Weehawken, New Jersey, and proceeded thence through the territorial waters of both states. Downriver tows likewise moved through the waters of each state to reach New York harbor. Thus, the revenues sought to be taxed derived from towages originating and terminating in New York State, but made up in and moving in part through New Jersey. It was impossible to segregate that part of the journey in New Jersey from the part taking place in New York. Allowing the tax to apply on revenue from the whole journey, the court said:

" . . . But transportation between the ports of the State is not interstate commerce, excluded from the taxing power of the State, because as to a part of the journey the course is over the territory of another State. . . ."

And the same reasoning, with emphasis on the avoidance of multiple taxation, supports *Ott v. Mississippi Valley Barge Line Co.*, 336 U. S. 169, 93 L. Ed. 585, 69 S. Ct. 432 (1949).

The idea of apportionment to permit state taxing of interstate incidents by methods compatible with the free flow of goods emerges clearly in *Memphis Natural Gas Co. v. Stone*, 335 U. S. 80, 92 L. Ed. 1832, 68 S. Ct. 1475 (1948); again, avoidance of multiple taxation is set up as one of the tests by which the commerce clause may be understood. In that case, Mississippi sought to impose an excise tax upon all corporations doing business in Mississippi measured by the value of the capital used, invested or employed within the state. A Delaware corporation, owning and operating a natural gas pipeline running from Louisiana into Tennessee, but having 135 miles of pipe and two compressing stations in Mississippi, was held liable for the Mississippi excise even though the Delaware corporation never qualified to or engaged in intrastate commerce in Mississippi. It had no resident agent or officer within the state and its only employees there carried on maintenance duties exclusively. The Mississippi excise tax was upheld, notwithstanding that the pipeline company paid ad valorem taxes on all of its property within Mississippi. Here again

validity of the tax depends upon freedom from multiplicity of taxation, for it was there said:

" . . . A glance at the activities, named above, . . . shows that there is no possibility of multiple taxation through the same exactions by other states. . . ." *Memphis Natural Gas Co. v. Stone, supra.*

Excises levied upon the privilege of doing business within a state, if there is no possibility of the same exaction by another state, may properly be levied upon the gross proceeds derived from the activities taking place within the taxing state even though the goods or transactions involved are affected by, or affect in some way or another, interstate commerce.

■ Closely related to the question of interstate commerce generally, in the instant case, is the problem arising from the interruption of the movements of logs from Oregon to Washington and Washington to Oregon when the plaintiffs tie the log rafts at plaintiff Smith's log storage areas in the Washington waters of the Columbia. This very situation has been the subject of a number of cases. In *General Oil Co. v. Crain*, 209 U. S. 211, 52 L. Ed. 754, 28 S. Ct. 475 (1908), it was said:

" . . . Property, therefore, at an intermediate point between the place of shipment and ultimate destination may cease to be a subject of interstate commerce. Necessarily, however, the length and purpose of the interruption of transit must be considered."

If the delay or interruption is not necessary to the means of transportation but rather to facilitate distribution, *i.e.*, involves the putting in and removing from storage, the activity and the property are assessable by the state wherein the interruption takes place.

*Texas Co. v. Brown*, 258 U. S. 466, 66 L. Ed. 721, 42 S. Ct. 375 (1922), cites *American Steel & Wire Co. v. Speed*, 192 U. S. 500, 48 L. Ed. 538, 24 S. Ct. 365 (1904), and

" . . . settles the principle that goods brought into a State, not from a foreign country but from another State, having reached their destination and being held in storage awaiting sale and distribution, enjoying the protection

which the laws of the State afford, may without violation of the commerce clause be subjected to nondiscriminatory state taxation . . ."

And the same principle inheres in *Pittsburg & So. Coal Co. v. Bates*, 156 U. S. 577, 39 L. Ed. 538, 15 S. Ct. 415 (1895), where coal consigned to New Orleans was brought by barge from Pennsylvania down the Mississippi River to Louisiana and there moored in the river at a place some distance from New Orleans awaiting orders for disposition. The journey of the coal to its ultimate destination in New Orleans might be interrupted "for a year or two years, or only for a day," but was, nonetheless, held subject to taxation by Louisiana on the basis that interstate commerce had ended with the mooring of the barges in the river.

While it is likely that property actually in transit in interstate commerce is exempt from state taxation, *Kelley v. Rhoads*, 188 U. S. 1, 47 L. Ed. 359, 23 S. Ct. 259 (1903), declares the rule that if the property "be stored for an indefinite time during such transit, at least for other than natural causes, or lack of facilities for immediate transportation, it may be lawfully assessed by the local authorities." To preserve the interstate character of the shipment, the interruption must be due to the requirements of navigation or travel or emergencies arising from the hazards thereof and not for any beneficial purpose inuring to the owner of the goods or the carrier. This point is made in *Champlain Realty Co. v. Brattleboro*, 260 U. S. 366, 67 L. Ed. 309, 43 S. Ct. 146, 25 A.L.R. 1195 (1922), where it was held that logs stopped temporarily to mitigate the hazards of transportation and for no other purpose were not deemed taxable by the state.

And, later, "Not what ultimately happens to the goods or where they finally go, but the occasion and purpose of the interruption are controlling." is the statement in *Independent Warehouses, Inc. v. Scheele*, 331 U. S. 70, 91 L. Ed. 1346, 67 S. Ct. 1062 (1947). The court then says:

"Here the cessation takes place not simply for the carrier's transit reasons relating to the necessities or con-

338

venience of the journey, but for reasons primarily concerned with the owner's business interests. . . ."

To the same effect is *Coe v. Errol*, 116 U. S 517, 29 L. Ed. 715, 6 S. Ct. 475 (1886), in which it was decided that logs having started on their journey within the state, but being held at a place until convenient to send them to their out-of-state destination, did not begin their journey in interstate commerce until the start of their final movement from the place where held.

In the instant case, the record does not make clear the length of time during which the logs are stored in plaintiff Smith's log storage areas for distribution ultimately to points both in Oregon and Washington. The record does make clear, however, that the interruption in the movements in either direction does not arise from the necessities of navigation or the hazards and requirements of the movement of logs but, to the contrary, the storage takes place for the business convenience and benefit of both the plaintiffs and consignees of the logs in both states.

 Accordingly, we think that the storage of logs in the log storage area in Washington for indeterminate periods, even though they remain destined for the same consignee after removal from the storage area, marks the end of interstate commerce for the logs brought from Oregon to Washington and the beginning of interstate commerce for logs traveling from the log storage area into Oregon.

 And the reasoning by which we have segregated the intrastate incidents from interstate commerce so as to avoid multiplicity of taxation upon interstate commerce applies with equal force to the work undertaken by plaintiffs' tugboats in assisting oceangoing vessels in docking at and departing from Washington waters. We conclude that tugboats participating in guiding, towing and pushing oceangoing vessels engaged in foreign and interstate commerce, and in turning the ships after docking or moving them from one pier to another, are engaged in a taxable business activity when performed within the territorial waters of Washington. Since the respondent seeks to tax only that portion of these activities which takes place

in Washington's territorial waters of the Columbia, the assessment is lawfully apportioned as being neither a duplicitous tax nor an impermissible burden on interstate commerce. See *Martin Ship Ser. Co. v. Los Angeles*, 34 Cal. (2d) 793, 215 P. (2d) 24 (1950).

 This brings us to the final activity sought to be taxed by the respondent, *i.e.*, the renting of items of personal property, such as boom sticks, tugboats and other maritime equipment, to residents of Washington, notwithstanding that the rental is paid to appellants at their offices in Oregon.

We believe that such rental contracts constitute engaging in business in Washington so as to render the gross proceeds therefrom subject to the business and occupation tax. See *Stone v. Stapling Machines Co.*, 220 Miss. 470, 71 So. (2d) 205 (1954), appeal dismissed 348 U. S. 802, 99 L. Ed. 633, 75 S. Ct. 31 (1954); *State ex rel. Hays v. Robertson*, 271 Mo. 475, 196 S.W. 1132 (1917).

 Passing now to the question of apportionment at 50 per cent where appellants' books and the vagaries of navigation on the Columbia make a precise mathematical formula impossible, we consider that the state acted fairly and reasonably. The burden of segregating taxable income from exempt income rests upon the taxpayer. *Tidewater Terminal Co. v. State*, 60 Wn. (2d) 155, 372 P. (2d) 674 (1962); RCW 82.32.180.

Thus, where an apportionment cannot, because of one reason or another, be made with reasonable mathematical certainty from the books and records of the taxpayer, and the tax commission, acting with reasonable prudence and circumspection with regard to all of the circumstances of the taxpayer's business, declares an apportionment which it deems to be reasonable, the burden then rests upon the taxpayer to show that the apportionment fixed by the tax commission is unreasonable, excessive, or has been arbitrarily and capriciously achieved. Nothing in the record shows us that the 50 per cent apportionment where employed by the tax commission was either unreasonable, excessive, arbitrary or capricious.

We therefore finally conclude that neither the commerce clause of the federal constitution, Art. 1 § 8, the federal regulatory and licensing acts pertaining to licensing for coastwise trade and regulating of waterborne interstate commerce, 46 U.S.C.A. § 251, *et seq.*, 49 U.S.C.A. §§ 901-923, respectively, nor the Oregon Admission Act, 11 Stat. 383, chapter 33, § 2, prevent or preclude the state of Washington from imposing on plaintiffs the business and occupation tax for the privilege of engaging in business activities on the Columbia River within the territorial boundaries of the state of Washington.

The judgment is affirmed, therefore, in all respects.

ALL CONCUR.