**UNITED STATES of America,
Plaintiff,**

**v.**

**Gregory GILMORE, Defendant.**

**No. 04 CR 1073 ILG.**

United States District Court,
E.D. New York.

Jan. 19, 2007.

Peter Kirchheimer, The Legal Aid Society, Brooklyn, NY, for Defendant.

Sean Patrick Casey, United States Attorney's Office, Brooklyn, NY, for Plaintiff.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

On May 27, 2005, the defendant pleaded guilty, pursuant to a plea agreement, to Count Three of a Four Count superseding indictment. That Count alleges that:

On or about March 20, 2004, within the Eastern District of New York and elsewhere, the defendant, Gregory Gilmore, being a parent and having custody and control of a minor child, did knowingly and intentionally permit said minor child to engage in sexually explicit conduct, for the purpose of producing visual depictions of such conduct, to wit: the image depicted in the computer file entitled pleasefit.jpg, which visual depictions were produced using materials that had been mailed, shipped and transported in interstate and foreign commerce, to wit: a digital camera.

(Title 18, United States Code, Sections 2251(b), 2251(c) and 3551, *et seq.)*

The minor child referred to above was his 9 year old daughter. The visual images depicted on the computer file to which reference is made in the indictment are described in the Presentence Report (PSR), prepared for the Court as required by Rule 32(c), Fed. R. Cr. P. Those images will be discussed hereafter.

The plea agreement entered into between the defendant and the government explicitly stated that the maximum term of imprisonment for the crime alleged in Count Three was 30 years and the mandatory minimum term of imprisonment was 15 years. A maximum 5 year term of supervised release to follow any term of imprisonment and a maximum fine of $250,000, which may be imposed was also explicitly stated as was the $100 mandatory special assessment.

The agreement went on to provide that the defendant understood that the Guidelines, although advisory, were required to be considered by the Court in arriving at an appropriate sentence. The agreement then set out the total offense level the Guidelines were likely to advise which was a term of imprisonment for life.

The defendant, in paragraph 4 of the agreement, knowingly and voluntarily waived his right to file an appeal or otherwise challenge his conviction or sentence in the event he was sentenced to a term of imprisonment of 360 months or below.

When pleading guilty, the following colloquy was recorded:

Q: Did Mr. Kirchheimer tell you that the maximum sentence which the statute you're charged with violating provides for imprisonment of up to 30 years?

A: Yes, he did.

Q: Did he also tell you there's a minimum term of imprisonment that would have to be imposed of fifteen years?

A: Yes, he did.

* * *

Q: And in this plea agreement that you've signed there were some estimates made as to what the guidelines in your case may be, although there is a mandatory minimum of fifteen years and a maximum of thirty.

You've been all through that, have you?

A: Yes, we have.

Q: You're telling me that [you're guilty] in consideration of this plea agreement that you have entered into with the government?

A: Yes.

Q: You've gone over that agreement with Mr. Kirchheimer?

A: Yes, I have.

Q: Do you believe you understand it?

A: Yes, I do.

Q: Do you want me to go over it with you as well?

A: No.

Q: You understand that in the fourth paragraph of that agreement you have agreed you won't file an appeal or otherwise challenge your conviction or sentence in the event the term of imprisonment is not more than three hundred sixty months.

Do you understand that you have agreed to that? A: Yes, I have.

Q: And you have agreed to waive your right to appeal in those instances voluntarily?

A: Yes.

Q: You understand what it means to give up your right to appeal?

A: Yes.

Q: Has anybody made any promises to you as to what your sentence will be?

A: No.

Q: On the date indicated in March of last year, namely March 20, you were the parent and had custody of a minor child?

A: Yes.

Mr. Kirchheimer: Judge, the defendant and I have spent some time working on a specific allocution and I ask that he be permitted to state that at this point in time.

The Court: I'll hear him.

A: On a number of occasions between January 2003 and January 2005 I've engaged in sexual conduct with my daughter, including touching her anus and vagina with my penis.

On a number of occasions between January 2003 and January 2005 I engaged in sexual conduct with my daughter, including touching her anus and vagina with my penis and mouth and touching her mouth with my penis and also touching her body.

Q: How old was your child at the time?

A: Nine years old. Near these organs on at least one occasion, I've entered her vagina with my penis. On a number of these occasions I took pictures of me touching her, having sex with her and also pictures of her. I do not remember the exact dates, but on or about March 20, 2004 and May 1, 2004 are approximately correct for dates of which I took pictures of sexual conduct with her.

Q: Where did all this take place, Brooklyn, Queens?

A: Jamaica, Queens.

The PSR subsequently prepared reflected the Probation department's determination that an *ex post facto* determination would exist if the Guidelines Manual in effect when the sentence was imposed was used, because the total offense level of life imprisonment would be higher than the total offense level the Guidelines Manual in effect at the time of the commission of the offense would provide which was 97–121 months. No exception was taken or objection made to the PSR by either the defendant or the government.

The PSR describes the defendant's entry to an AOL chat room on May 25, 2004, in which the topic concerned the exploita-

tion of minors aged 2 to 8 and the trading of digital clips of child pornography. Shortly thereafter, on the same day, the defendant began a private conversation with an undercover FBI agent in which the defendant announced that he had child pornography video clips and images. He then sent the undercover agent a video clip of a female toddler being orally and vaginally penetrated.

During a conversation in his home with the FBI agents on October 12, 2004, the defendant admitted to having 200–250 digital photograph images and 10 to 20 video clips of child pornography he described as "explicit" and "sexual," saved on his computer, involving girls from newborn to 13 or 14 years old. He estimated that he transmitted at least 5 digital child pornography images per day for the past 3 or 4 months.

A forensic analysis of the defendant's computer hard drive, seized pursuant to a search warrant, revealed images which are graphically described in the PSR and which are so vividly obscene and depraved that decency precludes their publication here. Pages 6–10 of the PSR should be sealed and made available to the Court of Appeals in the event of another appeal.

During the defendant's initial arrest for the instant offense, a personal-use amount of marijuana was found in his apartment. The investigation into the instant offense also uncovered additional criminal activity that could not be calculated into the guidelines, including the following: an additional 662 digital images and 10 video clips of child pornography found on the defendant's computer, his distribution of the child pornography he produced of Jane Doe, and the repeated times he sexually abused Jane Doe. *While none of these factors could be calculated into his guidelines, the additional criminal activities can nevertheless be considered aggrava-ting factors at sentencing.* ¶ 100 PSR. (emphasis added.)

The defendant was sentenced on October 25, 2005, at which proceeding the mother of the child requested to be heard and was, pursuant to 18 U.S.C. § § 3771(a)(4) and (d)(1). She made the following statement.

THE COURT: Is there something you would like to say to the Court:

THE WITNESS: Yes. I would like to speak on my daughter and our entire family's behalf.

What has happed to our baby was no doubt mean and inconceivable. Not only was this crime committed by someone who should have been keeping her from harm but by the one who gave her life. How ironic. Now she must spend the rest of her life getting over the nightmares, the distrust, and the memories that has plagued her.

My little girl is not alone in this struggle. She has a six-year-old brother who is constantly fighting for the affection that she used to give him, now she can't because he's a boy. Her stepfather, and I have to keep reassuring her that we love her, and had no idea that these things were happening. So, in turn, we are going through our own battle of healing.

What I'm trying to say is we've been sentenced to a lifetime of unforgiven pain and we are asking the Court to do the same. This man should be sentenced to the max plus so he could not inflict his unnatural desires upon other children and cause any more grief.

The defendant was then sentenced to imprisonment for the maximum term of 30 years, to be followed by a term of supervised release of 5 years. I set out at some length the Court's statements as a prelude to that sentence.

Mr. Gilmore, I can't remember, and I've been a judge of this court for about 24 years now, having been so disturbed about conduct which I can't find words to adequately describe. It's not just the conduct, but what I find almost indescribable and adding to the acts which you performed upon your own daughter; the discussions you had about it in chat rooms discussing what it was that you did and suggesting what other people might consider doing which, to me, bespeaks * * * a level of immorality which is just beyond belief.

Now, some years ago, actually, it was only January of this year, that the Supreme Court of the United States declared the guidelines unconstitutional. I'm sure Mr. Kirchheimer has talked to you about that. They nevertheless told the trial court that we mustn't ignore that completely. We must still look to them for guidance and, more specifically, they instructed us to consider the factors in one statute which Mr. Kirchheimer, I would suspect, has discussed with you, section 3553(a), which instructs the Court to consider the nature and circumstances of this offense and I have been hopelessly inarticulate in my ability to adequately describe the nature and circumstances of this offense and then that statute says we should consider the need for the sentence imposed to reflect the seriousness of the crime; to provide punishment which is appropriate; to consider adequate deterrence, protection of the public.

But, there is another section in § 3553, it's subdivision (b)(2) which deals specifically with child crimes and sexual offenses and it says:

'In sentencing a defendant who has committed the kind of crime which brings you here, the court shall impose a sentence of the kind and within the range referred to in the preceding section unless the Court finds an aggravating circumstances of a kind or to a degree not adequately taken into consideration by the Commissioner.'

And, I would find it hard to conceive that the Sentencing Commission could possibly have conceived the kind of behavior which is described in this sentencing report.

The defendant objected to the use of the advisory Guidelines at the time of sentencing as being violative of the *ex post facto* clause of the Constitution (Tr. at 7), and on the ground "that the facts set forth in the presentence report do not take the conduct out of the heartland of the Guideline ... and we object to the sentence on that ground...." (Tr. at 9)

The defendant appealed, arguing that the court erred by not providing him with notice of its intention to impose a non-Guidelines sentence. The Court of Appeals vacated the sentence and remanded the case for re-sentencing. In doing so, it relied on its recently decided *United States v. Anati*, 457 F.3d 233 (2d Cir.2006), which held that Rule 32(i)(1)(C), or what is now 32(h), requires a district court to notify the defendant of its intent to impose "an adverse non-Guidelines sentence and an opportunity to challenge the grounds for such a sentence. It was, therefore, plain error for the district court to not do so in this case." *U.S. v. Gilmore*, 471 F.3d 64, 65 (2d Cir.2006). In further support of its decision, the Court cited *Burns v. United States*, 501 U.S. 129, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991); *United States v. Carter*, 203 F.3d 187, 190 (2d Cir.2000); *United States v. Palta*, 880 F.2d 636, 640 (2d Cir.1989) and *United States v. Rivera*, 192 F.3d 81, 88 (2d Cir.1999), all pre-dating *Booker*.

The Court then concluded as follows:

we exercise our discretion to notice the district court's plain error because, by not providing the required notice, the fairness, integrity, or public reputation of the sentencing proceeding was seriously affected. As we observed in *Anati*, notice of an intention to impose a non-Guidelines sentence not only prevents unfair surprise to the defendant but also facilitates the 'adversarial testing of factual and legal considerations relevant to sentencing.' *Anati*, 457 F.3d at 237. Absent notice and the meaningful opportunity to be heard that it provides, we cannot be confident that the issues that affected sentencing were as thoroughly tested as Rule 32 intends.... A remand for resentencing is necessary to resolve that uncertainty. 471 F.3d 64, 66–67.

It is important to note that footnote 1 reveals that the government conceded that the defendant's Guideline sentence estimated in the plea agreement to be 360 months in reliance upon the Guidelines Manual of 2004, in effect at the time of sentencing was erroneous and, perhaps relying on that error declined to enforce Gilmore's waiver of his right to appeal if the sentence imposed is 360 months or below.[1]

### Discussion

### I

A. *The Government's Concession*

■ I begin by commenting on the government's concession that it erroneously applied the Guidelines in effect at the time of sentencing in estimating the defendant's sentence to be the full 360 months, and declining to enforce his waiver of his right to appeal, presumptively based upon its view that applying the Guidelines post-

*Booker* ran afoul of the *ex post facto* clause. Those concessions were misguided.

The *ex post facto* issue was squarely presented to the Court in *United States v. Demaree*, 459 F.3d 791 (7th Cir.2006), in which the defendant pleaded guilty to offenses as to which the Guidelines range in effect at the time she committed them was 18 to 24 months. The 2004 Guidelines Manual, in force at the time of sentence, provided for a range of 27—33 months. The Court, as required by 18 U.S.C. § 3553(1)(4)(A)(ii) and U.S.S.G. § 1B1.1(a) sentenced her to 30 months. The Court found the question before it to be as follows: "The only question presented by this criminal appeal is whether, the federal sentencing Guidelines having been made advisory by the Supreme Court in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), a change in the Guidelines that expands the Guidelines range for a crime is an *ex post facto* law and so cannot be applied to a defendant who committed his crime before the change." *Demaree*, 459 F.3d at 792. The Court held "that the *ex post facto* clause should apply only to laws and regulations that bind rather than advise...." *Id.* at 795.

*Demaree* was preceded by *United States v. Barton*, 455 F.3d 649 (6th Cir.2006), in which the Court wrote at 655, n. 4:

When the Guidelines were mandatory, defendants faced the very real prospect of enhanced sentences caused by changes in the Guidelines or changes in the interpretation of Guidelines that occurred after they had committed their crimes. Now that the Guidelines are advisory, the Guidelines calculation pro-

---

1. The footnote as it appears in the Court's opinion inaccurately describes the waiver as applicable to any *sentence under 360 months*.

vides no such guarantee of an increased sentence, which means that the Guidelines are no longer akin to statutes in their authoritativeness. As such, the Ex Post Facto Clause itself is not implicated.

The same result has been reached in this Circuit. In *United States v. Fairclough*, 439 F.3d 76, 79 (2d Cir.2006)(*per curiam*), cert. denied —— U.S. ——, 126 S.Ct. 2915, 165 L.Ed.2d 937 (2006), the Court affirmed the district court's retroactive application of *Booker's* remedial holding, reasoning that the defendant "had fair warning that his conduct was criminal, that enhancements or upward departures could be applied to his sentence under the Guidelines based on judicial fact-findings, and that he could be sentenced as high as the statutory maximum." In *United States v. Holguin*, 436 F.3d 111, 119–20 (2d Cir.2006), cert. denied, —— U.S. ——, 126 S.Ct. 2367, 165 L.Ed.2d 290 (2006), the Court held that retroactive application of *Booker* to cases on direct review did not violate *ex post facto* principles. *See United States v. Snow*, 462 F.3d 55 (2d Cir. 2006), to the same effect and in which the Court observed that "... since the Ex Post Facto Clause of the Constitution is a limitation on the retroactive application of *legislation* [it] therefore, does not apply to the courts." *Id.* at 66, n. 12 (citing *Rogers v. Tennessee*, 532 U.S. 451, 457–60, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001) (emphasis in original)).[2] *See also United States v. Vaughn*, 430 F.3d 518 (2d Cir.2005). *But see United States v. Safavian*, 461 F.Supp.2d 76 (D.D.C.2006).

It follows that the government's error in presuming an *ex post facto* violation was compounded by declining to enforce Gilmore's waiver of his right to appeal. *See,*

*e.g., United States v. Morgan*, 406 F.3d 135, 136 (2d Cir.2005); *United States v. Haynes*, 412 F.3d 37, 39 (2d Cir.2005); *Adesina v. United States*, 461 F.Supp.2d 90 (E.D.N.Y.2006).

### B. *The Notice Requirement and Was it Given*

■ As has already been noted, Gilmore was sentenced on October 25, 2005, and as has also been noted, his sentence was vacated and the case remanded for sentencing because the Court's failure to give him the notice provided for by Rule 32(h), Fed. R. Cr. P., citing *United States v. Anati*, 457 F.3d 233 (2006). That Rule provides:

> Before the Court may depart from the applicable sentencing range on a ground not identified for departure *either in the presentence report* or in a party's prehearing submission, the Court must give the parties reasonable notice that it is contemplating such a departure. The notice must specify any ground on which the court is contemplating a departure. (emphasis added)

*Anati* was decided on July 20, 2006, nine months after Gilmore was sentenced on October 25, 2005. At that time, the only cases squarely addressing the issue whether Rule 32(h) should apply to non-Guidelines sentences were *United States v. Egenberger*, 424 F.3d 803 (8th Cir.2005), cert. denied, —— U.S. ——, 126 S.Ct. 1106, 163 L.Ed.2d 917 (2006) and *United States v. Salter*, 418 F.3d 860, 862 (8th Cir.2005). In *Egenberger*, the defendant's *pre-Booker* plea agreement contemplated a sentencing range of 18–24 months. The *post-Booker* PSR recommended a sentencing range of 30–37 months. The court imposed a sentence of 30 months and the defendant ap-

---

**2.** It should be noted that the precise *ex post facto* issue was raised by the defendant in *United States v. Kumar,* 04 CR 846(ILG) and the government successfully argued that it was inapplicable.

pealed asserting that the failure to apply the *pre-Booker* mandatory Guidelines violated her Fifth Amendment due process rights. The Court held that "Egenberger's plea agreement did not guarantee a mandatory application of the Sentencing Guidelines" 424 F.3d at 804. It then went on to observe that "Egenberger had sufficient notice of the penalties she faced to satisfy due process concerns. The core concepts of due process are 'notice, foreseeability and in particular, the right to fair warning.' This is not a case where the defendant was entitled to notice that the court, in its Sentencing Guidelines calculations, was contemplating an upward departure that was not stated in the PSR as a ground for departure.... Instead, the Court properly calculated the advisory Guidelines range, and only then, after considering all of the additional § 3553(a) factors as required by *Booker* did the district court enter a sentence that was above the advisory Guidelines range," *Id.* at 805 (quoting *Rogers v. Tennessee,* 532 U.S. 451, 459, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001)). The Court also noted that the defendant had notice of the 15 year maximum sentence and that the sentence imposed was well within that maximum. *See id.* at 806.

Although decided one month after sentence was imposed, the Court's observation in *United States v. Simmerer,* 156 Fed. Appx. 124 (11th Cir.2005) is pertinent. "There is no precedent from this court or from the Supreme Court establishing that Fed. R. Cr. P. 32 applies to a post-*Booker* upward variance. In the 'absence of any controlling precedent' supporting Simmerer's position that there was error, the district court's failure to give notice in compliance with Rule 32 cannot be plain error." *Id.* at 128 (citation omitted). The Court also concluded in that case that the defendant's sentence did not violate the *ex post facto* clause because he was sentenced within the statutory maximum and had sufficient warning of the statutory maximum under the United States Code. *See id.*

Gilmore had notice by the explicit terms of his plea agreement that the statutory maximum term of imprisonment for the crime to which he pleaded guilty was 30 years and the mandatory minimum term of imprisonment was 15 years. He also had notice by the explicit terms of his plea agreement that the likely adjusted offense level under the Guidelines would be level 46 which carried a term of imprisonment for life. However, given a statutory maximum of 30 years, he was advised that the applicable Guideline sentence will be 360 months. (Plea Agreement, ¶ 2.) It is worth noting, if not ironic, that in *United States v. Pimentel,* 932 F.2d 1029 (2d Cir. 1991), the Court wrote, "... [A]ppeals involving claims of unfair surprise would be significantly reduced if the Government would at least inform defendants, prior to accepting plea agreements, as to the likely range of sentences that their pleas will authorize under the Guidelines.... [G]iven the Government's unique expertise in muddling through the complexities of the Guidelines, providing defendants with this information would hardly be a great burden. .... Consequently, we suggested that district courts should, where feasible, explain to the defendants before accepting their pleas what sentence is likely to be imposed." Id. at 1034. This district court did precisely that.

It is also worth noting, if not similarly ironic, that in *Pimentel* the Court also wrote, that "By providing the appellant with a copy of the PSR, the Government provided him with notice of all the relevant information that could be used against him, and at his sentencing hearing, appellant had a meaningful opportunity to challenge the accuracy and sufficiency of this

information. Due process requires no more." *Id.* at 1032 (citations omitted.) As has been stated above, the PSR was provided to Gilmore to which he took no exception and voiced no objections.

To the extent that the Court of Appeals wrote that in not providing Gilmore the notice required by Rule 32(h), this Court's error was plain, "because our holding in *Anati* was clear" it suggests that the Court should have been aware of that clear holding some nine months before it was decided. Perhaps I was remiss in not having divined as best I could what would be the event of an appeal in the case before me.[3]

Rule 32(h) codified the holding in *Burns,* which was decided pre-*Booker* and its continued viability in this post-*Booker* era is an issue over which the Circuits are virtually evenly divided, *see Anati,* 457 F.3d at 236. The final resolution of that issue must await a determination of it by the Supreme Court and no useful purpose will be served by discussing the pros and cons here. The Court is moved, however, to make several additional observations relevant to the issue of notice.

As has been stated above, the mother of the victimized child requested and was permitted to make a statement pursuant to 18 U.S.C. § § 3771(a)(4) and (d)(1), providing the victim (including her mother), the right to be heard at sentencing. In that regard, the Court in *United States v. Vampire Nation,* 451 F.3d 189, 197, n. 4 (3rd Cir.2006) wrote, "Given that it would be impossible to predict what statements victims might offer at sentencing, it would be unworkable to require district courts to provide advance notice of their intent to vary their discretionary sentence based on victim statements that had not yet been made."

A comparison between the decision of the Court of Appeals here and in *United States v. Rivera,* 192 F.3d 81 (2d Cir.1999), is of more than passing interest. In this case, the Court wrote at 471 F.3d 64, 66–67, "He [Gilmore] has identified on appeal several arguments he could have made to challenge the district court's decision to impose a dramatically more severe non-Guidelines sentence had notice been provided.[4] *While we offer no assessment of*

---

**3.** In *Spector Motor Service v. Walsh,* 139 F.2d 809, 823 (2d Cir.1943), Judge Learned Hand observed in a dissenting opinion, that it is undesirable "for a lower court to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant; on the contrary I conceive that the measure of its duty is to divine, as best it can, what would be in the event of an appeal in the case before [me]."

**4.** An examination of Gilmore's Brief on Appeal reveals only the following at p. 19, "Here, for example, the defense was given no warning that the court was considering a departure based in larger measure on an online discussion that Mr. Gilmore had engaged in. *See* A. 33–34. Since the PSR had not flagged this as an 'aggravating factor,' PSR paragraph 100, the defense was caught by surprise without a chance to determine whether this exchange recounted real events

or was exaggerated." Paragraph 100 of the PSR has been set out above. The PSR, paragraph 17 reads: The forensic examination uncovered several internet-based communications between the defendant and other unknown individuals on chat rooms. The retrieved communications included the following: Set out in vividly lurid detail are six paragraphs of conversations to which no objection or exception was taken and which the Court characterized as follows at pages 4–5 of the sentencing transcript. "It's not just the conduct, but what I find almost indescribable and adding to the acts which you performed upon your daughter; the discussions you had about it in chat rooms discussing it was what you did suggesting what other people might consider doing, which, to me, bespeaks a kind of a level of immorality which is just beyond belief." The defendant had the PSR for months prior to sentencing and to assert that he was caught by surprise

*these arguments here ....*" (emphasis added.) In *Rivera,* pre-*Booker,* the Court wrote as follows: "Estremera's final argument is that the departure should be overturned because the district court gave no notice of its intention to depart prior to the sentencing hearing. We disagree. A failure of notice may be harmless error unless the defendant can specify arguments he would have made that the district court did not consider.... *The court thus considered—and rejected—the arguments that Estremera would have raised had he received notice of his intention to depart.*" 192 F.3d at 88 (emphasis added.)

In this vein, the observation by the Court in *United States v. Nappi,* 243 F.3d 758, 770–71 (3d Cir.2001), is exquisitely apt:

[I]t is significant that defense counsel has not provided any indication as to how, if given the proper notice and opportunity to comment, he could have challenged the information in the report in a manner that would have led the District Court to impose a lesser sentence within the Guideline range. Importantly, defense counsel has made no suggestion that the information in the report was inaccurate or false, or that the Court mischaracterized any information it cited from the state PSI.... In the circumstances, he has failed to show us anything that would even justify an inference, let alone prove, that the District Court's sentence was bound to be different if Nappi had been afforded a copy of the PSI in advance of the hearing and had been given an opportunity to comment on it.

(internal citations omitted).

It bears repeating that not only did Gilmore have the PSI for months prior to sentencing, but that he took no exception

by the chat room conversations is blatantly

or objection to any factual statements contained in it.

The Court accurately stated that "neither party disputes the accuracy of" the Probation Department's calculation of the Guidelines range as 97–121 months, 471 F.3d 64, 65, and later stated that "Gilmore was sentenced to a term of imprisonment fifteen years longer than the statutory minimum and twenty years longer than the top of the applicable Guidelines range" 471 F.3d 64, 66–67. The parties and the court overlook the last sentence of paragraph 91 of the PSR, viz., "However, in light of the statutory minimum, the Guideline range is restricted to 180 months." The sentence imposed was, therefore, fifteen and not twenty years longer than the top of the applicable Guideline range.

The Court of Appeals has vacated Gilmore's sentence and remanded the case for re-sentencing to "resolve the uncertainty" that "a critical sentencing determination" may have gone untested "by the adversarial process contemplated by Rule 32 and the Guidelines," and leaves the Court without confidence that the issues affecting sentencing were thoroughly tested. With great deference to the Court of Appeals and with the genuine respect that is its due and notwithstanding my belief that the defendant was provided with the notice Rule 32(h) required, I turn to the discharge of my obligation to re-sentence the defendant.

I begin with confidence in the belief that Gilmore is clearly on notice that the court contemplates a variance from the advice of the Guidelines because I have already done so, *see United States v. Cousins,* 469 F.3d 572, 582 (6th Cir.2006) (Gibbons, J., concurring in part and dissenting in part) and, for the reasons discussed, confident in the belief that he knew at the very least

disingenuous.

that the Guidelines range of 97–121 months estimated by the PSR had to be increased by a minimum of 59 months. At oral argument, that belief was confirmed, the defendant acknowledged having the relevant notice.

It would be an affectation of research to do more than cite *Booker/Fan Fan* and *United States v. Crosby*, 397 F.3d 103 (2d Cir.2005) for the teaching that although the Guidelines are no longer mandatory, they may nevertheless not be ignored and must be resorted to as advisory and "considered" together with the other factors listed in 18 U.S.C. § 3553(a). A review by the Court of Appeals of a sentence thus imposed is guided by the standard of "reasonableness." *See United States v. Ministro–Tapia,* 470 F.3d 137 (2d Cir.2006).

Turning then to the § 3553(a) factors to guide me in arriving at a sentence that is "reasonable," that section provides at the outset that "The Court shall impose a sentence *sufficient, but not greater than necessary,* to comply with the purposes set forth in paragraph (2)" and shall consider the following factors.

### A. *The Nature and Circumstances of the Offense*

The nature and circumstances of the offense are described above and need no further elaboration.

### B. *The History and Characteristics of the Defendant*

Attached to a letter dated October 18, 2005, to the Court from defense counsel in anticipation of sentence, was a Psychosexual Evaluation ("Evaluation") of the defendant prepared by Dr. Richard B. Krueger, M.D. who interviewed him for approximately three hours. The information elicited from Gilmore relevant to his "history and characteristics" as reported there and in the PSI will respond to this factor.

1. The defendant was born in Jamaica, Queens in 1973 to parents who separated when he was 4 and were formally divorced when he was 14. Following their separation, the defendant lived with his father and spent most weekends with his mother. The PSI recounts a physically abusive father of which no mention is made by Dr. Krueger. His elementary school education ended without completing the 9th grade and was marked by poor grades, poor attendance, cutting classes, fights and many other disciplinary problems. (Cf. Evaluation, p. 2 with PSI, ¶ 48.)

After leaving school, he was sent by his mother to the Job Corps from which he was "mentally discharged" after 6 months because he was "breaking things, stealing and getting into fights." (Cf. Evaluation, p. 3 with PSI, ¶ 49.)

His mother then sent him to a trade school which he attended for a year and a half and earned his GED.

### 2. *Substance Abuse*

The defendant began smoking marijuana at age 13, intermittently until age 18, when he used 7 to 10 joints per day on a regular basis until he was arrested. He began using cocaine in approximately 2001 and continued using cocaine for the better part of 4 years. He began drinking beer and hard liquor at age 13 and experimented with LSD and MDMA (Cf. Evaluation, p. 7 with PSI, ¶ 64–66.)

### 3. *Employment History*

After graduating from the trade school, he worked for 6 months as a housekeeper for the Holiday Inn until terminated for theft of services. He received public assistance and food stamps from 1991–1993. He worked in the housekeeping department of the Sheraton Hotel from 1992–1994 and quit because he felt too stressed

and overworked (Cf. Evaluation, p. 3, with PSI ¶ 81.) He worked at numerous temporary jobs until 2001 when he was employed until 2005 by Aramark Food Service as a Cook.

### 4. Criminal History

At age 16, he was arrested and convicted of selling crack cocaine to an undercover officer for which he was sentenced to 20 days in custody and 5 years probation. He told the Queens County Probation Officer that he began selling drugs at age 12, earning $50–$100 per day for 4 years which he spent on fast food and drugs (PSI ¶ 39.) The Evaluation reflects that he was arrested at age 14 for possessing crack cocaine and that the charges were dropped and the record sealed. It reflects that he had a third arrest in 2000 for possession of marijuana and a fourth arrest in 2001 for the same crime, neither of which is reported in the PSI (See Evaluation at pages 3–4.)

### 5. Mental and Emotional Health

The defendant was never hospitalized psychiatrically. His sole mental health treatment experience was weekly or monthly sessions with an unrecalled psychologist at age 13 for about one year. (Cf. Evaluation at p. 6, with PSI ¶ 61.)

### 6. His Sexual History—Deviant and Non–Deviant

I refer to PSI paragraphs 45, 46, 48 and 57, and Evaluation pages 8–9, which are hereby incorporated by reference.

The foregoing history and characteristics of the defendant needs no adjectival characterization.

### C. The Need for Sentence Imposed to Reflect Seriousness Of the Offense to Promote Respect for the Law and to Provide Just Punishment for the Offense

### 1. To Reflect the Seriousness of the Offense

How is "seriousness of the offense" to be measured? On what scale? Is the punishment prescribed by Congress for the offense of conviction a proper measure of seriousness? If so, a mandatory minimum term of imprisonment for 15 years and a maximum term of 30 years for the crime to which he pleaded guilty, is one indicator of seriousness. Another indicator is the Guidelines which reflects Congress' judgment as to the appropriate national policy for such crimes and which expresses the popular political will about sentencing, which represents decades of close attention to sentencing policy and represents 18 years of careful consideration of the proper sentence for federal offenses. *See United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir.2006), and *United States v. Rattoballi*, 452 F.3d 127 (2d Cir.2006). The Guidelines in effect when the sentence was imposed advised that the total offense level for this defendant's criminal conduct which the plea agreement acknowledged, carries a term of imprisonment for life. By any measure, they reflect a Congressional judgment of extreme seriousness.

Perhaps it may be thought that the seriousness of the offense is to be measured by its violence, or on some other scale such as the degree of moral outrage, depravity and blatant wickedness the offense would spark in the mind of the average person.[5]

---

**5.** In expressing that thought, I am mindful of the tension remarked by Judge Newman between the judge's personal view of the seriousness of the offense in enhancing a sentence and the judge's discretion to enhance a sentence because of the particular circumstances of a defendant's criminal conduct. *See Anati, supra,* at 237–238, and I will re-

## 2. To Promote Respect for the Law

The meaning of this factor is not altogether clear to me. How does the imposition of a sentence promote respect for the law when the defendant's conviction and criminal history plainly reflect his disrespect for the law. Perhaps this factor simply means that if sentence were not imposed it would signal that the law doesn't take itself seriously and is meant to convey to the defendant that he violated the law and must be punished for it to teach him that the law *does* take itself seriously and will exact its due from those who violate it.

## 3. To Provide Just Punishment for the Offense

What precisely is just punishment and how is it determined? By what yardstick? Reference has already been made to *Ebbers* and *Rattoballi* as conveying the view that a just sentence is to be discerned from the Guidelines which reflect the will of the people and decades of sentencing by federal judges. In this post-*Booker* and *Crosby* era, the imposition of sentences is to be guided by the standard of "reasonableness." That standard is an elusive one, defying definition and, I submit, is dependent entirely upon the subjective determination of the *nisi prius* judge imposing the sentence or on the

subjective determination of the appellate panel reviewing it.[6] The volume of sentencing appeals which, I believe I am correct in estimating, has considerably increased since *Booker/FanFan*, would lend support to that view. The Court of Appeals has candidly recognized its essential validity and articulated it in *Fairclough*, 439 F.3d at 79, thus: " 'reasonableness is inherently a concept of flexible meaning, generally lacking precise boundaries' " (quoting *Crosby*, 397 F.3d at 115), that a reviewing court "should exhibit restraint" in assessing reasonableness, *id.* (citing *United States v. Fleming*, 397 F.3d 95, 100 (2d Cir.2005)), and that we would not " 'fashion any *per se* rules as to the reasonableness of every sentence outside an applicable guideline.' " *Id.* (quoting *Crosby*, 397 F.3d at 115). Recalling that *Crosby* was written by Judge Newman, it is of more than passing significance that he wrote, after a year of post-*Booker* experience that:

> Although a sentencing judge is obliged to consider all the sentencing factors outlined in Section 3553(a), the judge is not prohibited from including in that consideration the judge's own sense of what is a fair and just sentence under all the circumstances. That is the historic role of sentencing judges, and it may continue to be exercised, subject to the reviewing court's ultimate authority to

frain from expressing a personal view as to seriousness. I will, instead, leave it, in the event, to those conducting appellate review to adjust that tension in passing upon the "reasonableness" of the sentence I impose. I confess to difficulty, however, in holding a personal view of seriousness of criminal conduct divorced from the circumstances in which the crime was committed.

**6.** Twenty five years ago Judge Friendly wrote Indiscretion About Discretion, 31 Emory L.J. 747 (1982), in which he grappled with the topic of the discretion of the trial judge. In a section of that article headed "What is Meant by Discretion?" finding most definitions of

discretion not very helpful, he made this unassailably real observation at p. 754: "When we are discussing the allocation of power between trial and appellate courts, I find it more useful to say that the trial judge has discretion in those cases when his ruling will not be reversed simply because an appellate court disagrees." That same unassailable reality, I would submit, holds generally true if the statement were that the trial judge has competence to determine "reasonableness" in those cases when his determination will not be reversed simply because an appellate court disagrees.

reject any sentence that exceeds the bounds of reasonableness.

*United States v. Jones,* 460 F.3d 191, 195 (2d Cir.2006).

I make reference to § 3553(b)(2) as I previously did, which, although declared fallen victim to *Booker* and excised by *United States v. Selioutsky,* 409 F.3d 114 (2d Cir.2005), is nevertheless, advisory and is properly considered in that light. In essence, the advice it gives is that the sentence the Guidelines might otherwise have required in a case of sexual exploitation and other abuse of children may be enhanced if there exists an aggravating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission. I gave heed to that advice and reaffirm the opinion I expressed before, that the Sentencing Commission could not have conceived the facts and circumstances in this case in formulating the Guidelines.

I call particular attention to footnote 5 of that opinion at 409 F.3d at 117 in which Judge Newman wrote: "Because subsection 3553(b)(2) was enacted after *Selioutsky's* offense, if this subsection were not excised, we would have encountered the issue of whether its application to him imposed adverse consequences prohibited by the Ex Post Facto Clause." The inference arguably drawn from that observation might appear to be that with (b)(2) excised and now merely advisory, considering it in determining Selioutsky's sentence would give rise to no Ex Post Facto consequence.

D. *To Afford Adequate Deterrence to Criminal Conduct*

Given the past history of this defendant, both special and general deterrence are appropriate aims of a just sentence. Special deterrence to discourage this defendant from committing such crime again and general deterrence to discourage others from committing such crimes and hopefully, others as well.

A related and justifiable reason for punishment is the legitimate concern that a mild rebuke would rightly be regarded as depreciating the seriousness of this serious crime. The sentence imposed should reflect blameworthiness, giving due regard to a proportionality that should fit the crime.

Of particular relevance to this case is *United States v. Kane,* 470 F.3d 1277 (8th Cir.2006). In a case of sexual abuse of the defendant's minor daughter, the district court sentenced the defendant to 120 months imprisonment, departing from an advisory Guidelines range of 210—262 months. The government appealed the sentence as unreasonable. The Court of Appeals agreed, holding that the 120 month sentence is not proportional to the circumstances of the crimes, is unreasonable and must be vacated and remanded for resentencing.

E. *To Protect the Public From Further Crimes of the Defendant*

This factor bespeaks a traditional role of sentencing-incapacitation. What has been related above of the nature and circumstance of his offense, his criminal history, and specifically, his sharing information via the internet with other pedophiles and sexual predators as to how they can anaesthetize their infant daughters preparatory to sexually abusing them marks him as a danger to society and protecting the public is a justification for incapacitating him.

F. *To Provide the Defendant With Needed Educational of Vocational Training, Medical Care or Other Correctional Treatment in the Most Effective Manner.*

Submitted as an attachment to a letter on his behalf dated October 18, 2005, was a

Psychosexual Evaluation of the defendant to which reference has already been made and which I now address. At the very outset, Dr. Krueger reports: "Both(sic) the patient was felt to be of only fair reliability. He tended to minimize aspects of his behavior, such as his use and abuse of drugs and his abuse of his daughter." Eight pages of single spaced history of Present Illness, Past Psychiatric History, Substance Abuse History, Past Legal History, Past Medical History, Past Family and Social History, Non–Deviant and Deviant Sexual History, then follows much of which echoes the PSR. Those histories are then followed by summaries of tests performed which are prefaced by this remarkable statement: "The patient said that he felt he had '100%' control over his sexual impulses" regarding which no comment is made by Dr. Krueger. That unambiguous declarative statement can leave no doubt that the defendant's conduct was intentional, knowing and voluntary.

A variety of tests are then summarized and in my view are inconclusive, but which nevertheless lead Dr. Krueger to opine that Mr. Gilmore is "clearly in need of treatment for pedophilia and I would suggest this." In fact [he] generally seems to be someone with such poor insight and motivation that he would not have brought himself to appropriate treatment left to his own devices. Now, incarceration has contained him and can continue to contain him in such a fashion that he can be exposed to appropriate sex offender and substance abuse treatment and benefit from it. (Evaluation p. 15). On p. 16, Dr. Krueger emphatically states that "He has pedophilia and is in need of treatment for this...."

     \*     \*     \*     \*     \*     \*

I understand that the Federal system has treatment programs for both his substance abuse and pediphilic disor-

ders. I discussed the nature of such treatment and he is willing to participate in such treatment. Overall at some point he will be released from prison, and it would be to his own and society's interests to have him engage in such treatment. Indeed his arrest and incarceration will afford him an opportunity which he would not otherwise have had to engage in and work on his problems. *If he does this and completes a treatment program then his overall risk after release will be reduced.* (emphasis added).

Opining that his "overall risk after release will be reduced" and stating that "Generally speaking, incest sex offenders have far and away a very low risk of recidivism," he again opines that "If he receives therapy in prison his *overall risk* will be lowered even more." (Evaluation p. 17). His repeated reference to *overall risk* bespeaks a recognition of a risk of recidivism even if quantified as being "low."

A careful reading of the PSR reflects a collection of digital images of unrelated female children being sexually abused at ages 2, 4 or 5, 12 or 13, which are not incestuous. *Cf. Smith v. Doe, et al.,* 538 U.S. 84, 103, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) (Legislative findings "are consistent with grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class. The risk of recidivism posed by sex offenders is 'frightening and high.' ")

I have dwelled at great length on the nature of the offense, the history and characteristics of the defendant and on the factors recited in 18 U.S.C. § 3553(a). I have done so conscious that justice is due this defendant as regards the sentence imposed but conscious too that justice is owed to the community for which I am

248

charged with the responsibility to speak, in imposing sentence.

Having considered all those factors, and having given thought as neutrally as I am capable of as to what is a fair and just sentence under all the circumstances I am driven to conclude that the defendant should be and is hereby committed to the custody of the Bureau of Prisons for a period of 360 months to be followed by 5 years of supervised release, a special assessment of $ 100. The defendant has knowingly and voluntarily waived his right to appeal if the sentence is not in excess of 360 months which I regard as a valid waiver dispensing with the need to advise him of his right to appeal and to make an application to have the appeal fee waived if he can't afford it—but in an excess of caution I advise him to that effect now.

SO ORDERED.